**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee*,

v.

PIROUZ SEDAGHATY,
    *Defendant-Appellant*.

No. 11-30342

D.C. No.
6:05-cr-60008-HO-2

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael R. Hogan, District Judge, Presiding

Argued and Submitted
December 3, 2012—Seattle, Washington

Filed August 23, 2013

Before: Mary M. Schroeder, M. Margaret McKeown,
and Richard C. Tallman, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Tallman

## SUMMARY[*]

### Criminal Law

The panel affirmed in part and reversed in part a criminal judgment and remanded for a new trial in a tax fraud case – that involved significant amounts of classified materials and in camera, ex parte reviews as well as classified proceedings – stemming from charges that the defendant falsified a 2000 charitable organization tax return in order to conceal his support of an independence movement in Chechnya.

The panel was not persuaded by the defendant's arguments regarding the classified material, the district court's evidentiary decisions, the notion that the government was one-sided in its effort to obtain evidence abroad, or his view that the government's characterization of the evidence rose to the level of a constitutional violation.

The panel held that the government violated its obligations pursuant to *Brady v. Maryland* by withholding significant impeachment evidence relevant to a central government witness.

After reviewing the classified record, the panel determined that the district court erred in approving an inadequate substitution for classified material that was relevant and helpful to the defense. The panel held that the substitution did not satisfy the requirement in the Classified Information Procedures Act, 18 U.S.C. app. 3 § 6(c)(1), that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the summary "provide the defendant with substantially the same ability to make his defense as would disclosure of the specified classified information."

The panel also concluded that the search that the government conducted of the defendant's computer hard drives went well beyond the explicit limitations of the warrant, and remanded to the district court to consider the appropriate scope of items seized and whether the exclusionary rule should apply.

Considering the errors both individually as well as cumulatively in light of the evidence as a whole, the panel concluded that the errors were prejudicial.

The panel filed concurrently, under appropriate seal, a classified opinion with respect to the substitution. That opinion also addresses in more detail the defendant's claim regarding foreign bank records.

Concurring in part and dissenting in part, Judge Tallman wrote that the opinion's recitation of the facts is inappropriately written from the perspective of the defense theory of the case, that the majority unduly constricts the text of the search warrant and disregards the underlying reason for the very existence of the exclusionary rule, that the opinion disregards the district judge's express factual findings and his rulings on the potential impact of challenged witness testimony following an evidentiary hearing, and that the opinion discounts the extraordinary efforts by the Department of Justice to abide by its criminal discovery obligations and the district court's extensive oversight of those efforts in dealing with extremely sensitive national security concerns.

**COUNSEL**

Steven T. Wax (argued), Federal Public Defender, Portland, Oregon; Lawrence Matasar, Lawrence Matasar, P.C., Portland, Oregon, for Defendant-Appellant.

Kelly A. Zusman (argued), Christopher Cardani, and Charles Franklin Gorder, Jr., Assistant United States Attorneys, Office of the United States Attorney for the District of Oregon; Virginia Marie Vander Jagt, Counsel, United States Department of Justice, Washington, D.C., for Plaintiff-Appellee.

**OPINION**

McKEOWN, Circuit Judge:

This is a tax fraud case that was transformed into a trial on terrorism. The case stems from charges that Pirouz Sedaghaty (known as Pete Seda) falsified a 2000 charitable organization tax return in order to conceal his support of an independence movement in Chechnya, a republic in the Caucasus mountains of southern Russia. Seda founded the U.S. branch of the Al-Haramain Islamic Foundation, Inc. ("Al-Haramain"), a Saudi Arabian charity that the U.S. government suspected of funding terrorist activities and supporting the Chechen mujahideen (holy warriors engaged in violent jihad against Russian forces) under the guise of humanitarian aid.[1] Seda's defense was based on his claim

---

[1] Seda was indicted along with the U.S. chapter of Al-Haramain, which was later dropped as a defendant, as well as an alleged co-conspirator, Soliman Al-Buthe, who remains a fugitive abroad.

that any discrepancy on the tax return could be traced to his accountant, as well as on his long history of peaceful engagement on behalf of Islam and his track record of charitable work in the United States and abroad.

The appeal illustrates the fine line between the government's use of relevant evidence to document motive for a cover up and its use of inflammatory, unrelated evidence about Osama Bin-Laden and terrorist activity that prejudices the jury. This tension was evident both before and during trial and dominates much of the briefing on appeal.

Similarly, what was charged as a tax fraud case in fact involved significant amounts of classified materials and multiple in camera, ex parte reviews as well as classified proceedings. These classified proceedings figure prominently in the appeal. To the extent possible, we have written our opinion without reference to classified materials so as to allow the maximum transparency in this criminal case. To supplement this opinion, we are filing concurrently, under appropriate seal, a classified opinion with respect to the substitution—a terse summary that the government provided Seda in place of actual classified documents that are relevant and helpful to his defense. That opinion also addresses in more detail Seda's claim regarding foreign bank records.

We recognize that a system that permits ex parte hearings and requires the court to pass on the legitimacy of claims related to classified information places a heavy burden on the court. We also recognize that defense counsel, who best know their client's interests, are placed at a serious disadvantage in challenging classified proceedings in a vacuum. Toward that end, we take our duty very seriously

and undertake our review of classified information with special scrutiny.[2]

Following his conviction for tax violations, Seda challenges a host of rulings. In particular, he takes aim at the prosecution's failure to disclose its interview notes regarding payments to a key witness, the court's handling of classified information under the provisions of the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3, the breadth of computer and other documents seized pursuant to a warrant, and various evidentiary rulings. Seda also claims that he was deprived of a fair trial by the government's refusal to aid him in obtaining evidence from overseas, by its appeal to religious preferences, and by its use of inflammatory evidence of guilt by association.

In the main, we are not persuaded by Seda's arguments regarding the classified material, the district court's evidentiary decisions, the notion that the government was one-sided in its effort to obtain evidence abroad, or his view

---

[2] Because of the strong public policy in favor of public access to judicial proceedings, we heard argument on nearly all of the issues on appeal in open court. On several very limited issues, we held an in camera hearing with counsel from the government and from the defense together, and then with the government ex parte. On one issue, we heard from a single government attorney who was not part of the prosecution team. The government trial lawyers were walled off from certain classified material so it would not taint the conduct of the prosecution.

We take note of the careful procedures instituted by the district court and followed by the government to protect classified information, as well as defense counsel's cooperation with these procedures. Our judgment as to the government's discovery violations is not a reflection on the trial court's good faith efforts to ensure a fair trial while protecting national security.

that the government's characterization of the evidence rose to the level of a constitutional violation. Nonetheless, there were significant errors that merit a new trial.

We conclude that the government violated its obligations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding significant impeachment evidence relevant to a central government witness. After reviewing the classified record, we also determine that the court erred in approving an inadequate substitution for classified material that was relevant and helpful to the defense. The substitution did not satisfy CIPA's requirement that the summary "provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C. app. 3 § 6(c)(1). We reject Seda's remaining challenges to the handling of classified information under CIPA. We also conclude that the search that the government conducted of Seda's computer hard drives went well beyond the explicit limitations of the warrant and remand to the district court to consider the appropriate scope of items seized and whether the exclusionary rule should apply.

We are particularly troubled by the cumulative effect of these errors, which resulted in admitting evidence illegally seized while denying Seda both material impeachment evidence and potentially exculpatory evidence. *See United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988) (emphasizing the cumulative effect of three trial errors improperly admitting impeachment evidence of a defense witness, erroneously bolstering the testimony of a prosecution witness, and admitting defendant's statements that should have been suppressed). Although each of these issues potentially merits a remand or a new trial on its own, given

these multiple, significant errors, "'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial. . . ." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *Wallace*, 848 F.2d at 1476). Considering the errors both individually as well as cumulatively in light of the evidence as a whole, we conclude that the errors were prejudicial and reverse and remand for a new trial. As a consequence, we do not address Seda's arguments regarding his sentence.

## BACKGROUND

In the 1990s, Al-Haramain was one of Saudi Arabia's largest non-governmental organizations, with more than fifty offices worldwide distributing humanitarian aid and funding religious education. With close ties to the Saudi government, it has been described by U.S. government officials as the "United Way" of Saudi Arabia. Apart from humanitarian aid and educational materials, however, some Al-Haramain offices distributed funding and other support to terrorists. Based on joint submissions by the governments of the United States and Saudi Arabia, the United Nations implemented sanctions against Al-Haramain offices in eleven countries beginning in 2002. By 2004, the Saudi government had dissolved Al-Haramain altogether. That same year, the United States designated former Al-Haramain principals Aqil Al-Aqil and Soliman Al-Buthe and the U.S. chapter of Al-Haramain as "Specially Designated Global Terrorists" subject to financial sanctions because of their role in providing financial support to terrorist groups. Seda came under investigation by the FBI and the IRS because of his role in the U.S. chapter of Al-Haramain.

Seda moved from his native Iran to Ashland, Oregon, in the 1970s. After attending Southern Oregon University, he became a well-known arborist in the city. With the mission of promoting the understanding of Islam and building bridges within the community, Seda cofounded the Qur'an Foundation with his friend David Rodgers, who had grown up in Ashland. The Qur'an Foundation hosted public lectures and distributed the Qur'an locally and to prisoners who requested copies.

While working as a horse trainer in Saudi Arabia, Rodgers was approached by Al-Haramain officer Al-Buthe, who suggested that Al-Haramain could supply Qur'ans to the Ashland effort. In 1997, the two organizations entered into a partnership to "promote peace through understanding of Islam" and Al-Buthe and Seda opened Al-Haramain's only U.S. branch ("Al-Haramain-U.S."). Al-Aqil became the U.S. branch's president, Al-Buthe its treasurer, and Seda its secretary. Seda opened a bank account for Al-Haramain-U.S. at Bank of America and successfully applied for tax-exempt status.

In late 1999, both Al-Haramain and its U.S. branch solicited funds for aid to the people of Chechnya. Although the efforts of Al-Haramain were conducted under the supervision of the Saudi government and through a separate entity the government created, the Saudi Joint Relief Committee, at trial it was disputed whether these efforts were truly humanitarian in nature or a cover to fund the mujahideen operating in Chechnya.

In February 2000, an engineer and construction executive in England, Dr. Mahmoud Talaat El-Fiki, contacted Al-Haramain saying that he wanted to donate $150,000 for

Chechen relief.  Al-Haramain instructed El-Fiki that he could wire the money for "the poor, orphans and refugees" in Chechnya to its Al-Rajhi Bank account in Riyadh, Saudi Arabia, or its Bank of America account in Ashland.  El-Fiki transferred $150,000 to the Al-Haramain-U.S. account in Ashland on February 24, 2000.  On March 7, Al-Buthe traveled from Saudi Arabia to Oregon.  Seda and Al-Buthe went together to a branch of Bank of America in Ashland on March 10 and met with the branch manager to withdraw $130,000 in travelers checks.  The following day, Seda withdrew a $21,000 cashier's check made out to Al-Buthe. Al-Buthe later returned to Saudi Arabia, cashed the travelers checks at his bank, and deposited the cashier's check into his personal account, where he often commingled personal money with Al-Haramain funds.  The counter check signed by Seda bore the notation "Soliman" and the actual cashier's check deposited by Al-Buthe bore the notation "Donation for Chichania Refugees."

At trial, the significance of Al-Buthe's use of travelers checks was contested.  The government characterized the use of travelers checks, as opposed to a less-expensive wire transfer, as highly suspicious and argued that it made the transfer of funds more difficult to trace.  The defense pointed out that Al-Buthe regularly brought funds in the form of travelers checks to the United States for Al-Haramain's operating expenses and reported those checks to U.S. Customs, so his use of travelers checks was not unusual, nor did it correlate with an effort to conceal the movement of funds.[3]  The bank manager testified that Seda set up an

---

[3] Between October 1997 and April 2001, Al-Buthe reported to U.S. Customs his transportation of $777,845 into the United States over nine different trips, seven of them involving travelers checks.  Every time Al-

appointment in advance so that he and Al-Buthe could meet with her in person, and that Al-Buthe came in his traditional Saudi dress, produced his passport to be copied for the bank's records, and personally signed each travelers check in front of her.

What happened to the money after Al-Buthe cashed the travelers checks and deposited the cashier's check was also disputed. Seda's attorneys argued that it was given to Al-Haramain and deposited in Al-Rajhi Bank account number 9889, which was used for humanitarian relief in Chechnya. The government represented that "[a]n Al-Haramain employee took most of El-Fiki's money to a representative of Abu 'Umar [a leader of the Chechen mujahideen], to be smuggled into Chechnya, claiming it was for needy Chechen families."

In June 2000, Al-Buthe returned to Ashland, reporting to U.S. Customs $300,000 in travelers checks from Al-Haramain for the purchase of a building in Springfield, Missouri, to serve as a prayer house. Having already made an initial deposit of $60,000, Al-Haramain-U.S. then paid $318,291 to complete the purchase of the Springfield building.

Four days after the September 11, 2001, terrorist attacks, several FBI agents came to speak with Seda. The interviewing agent testified that Seda had volunteered

---

Buthe reported the transportation of currency was when he was arriving in the United States and was presented with a customs form, like all other arrivals. Seda's attorneys maintained that Al-Buthe failed to report the transfer of El-Fiki's donation out of the United States because he did not know that it was required.

information about Al-Haramain-U.S.'s purchase of the Springfield property and told him Al-Haramain-U.S. had paid between $300,000 and $325,000, reflecting the closing price.

One month later, Tom Wilcox, Al-Haramain-U.S.'s accountant and a former IRS agent, filed a Form 990 for Al-Haramain-U.S. for the year 2000, reviewed and signed by Seda. Filing a Form 990 is an annual reporting requirement for tax exempt organizations. The Form 990 was inaccurate in several respects. Line 57a inaccurately represented the cost of the Missouri building purchase as $461,542 because the $130,000 withdrawn by Al-Buthe was marked as a payment for the prayer house. Line 1 underestimated the donations that Al-Haramain-U.S. had received because it misdesignated the $21,000 check to Al-Buthe as a returned donation. Line 22, representing outgoing donations, was also inaccurate because it failed to record whatever portion of the $150,000 El-Fiki donation was transferred to Al-Haramain.[4]

In 2004, the government obtained a warrant to search for financial records and communications pertaining to the preparation of the 2000 Form 990 and Al-Buthe's failure to report the $150,000 he was carrying when he left the country. The government searched Seda's house, which doubled as the Al-Haramain-U.S. office and prayer hall, and seized nine computers together with books, videos, and religious materials. Before trial, Seda challenged the seizures as going beyond the scope of the warrant; the district court denied his motion to suppress.

---

[4] The defense argued that because the donation merely passed through Al-Haramain-U.S. on its way from El-Fiki to Al-Haramain in Riyadh, none of the mistakes are material because the tax code did not require the "pass-through" to be recorded at all.

The grand jury indicted Seda, Al-Buthe, and Al-Haramain in a three count indictment. Count One alleged a conspiracy to defraud the United States through the crimes alleged in counts Two and Three, in violation of 18 U.S.C. § 371. Count Two alleged filing a false Form 990, in violation of 26 U.S.C. § 7206(1). Count Three charged Al-Buthe with failing to file a Currency and Monetary Instrument Report (CMIR) form when he left the United States with $150,000, in violation of 31 U.S.C. § 5316(a)(1)(A). The charges against Al-Haramain were eventually dismissed because, by the time of trial, it was little more than a shell organization.

The central issue at trial was whether the errors on the Form 990 were willful. The prosecution's theory was that Seda wanted to fund the Chechen mujahideen and intentionally reported false information to his accountant in an effort to cover up the diversion of El-Fiki's donation to the mujahideen. The primary defense theory was that Wilcox was responsible for these careless mistakes, that Seda had given the money to Al-Buthe to give to Al-Haramain, and that Seda was transparent and forthright with Wilcox, the FBI, and the public about the disposition of Al-Haramain-U.S.'s funds and his desire to provide humanitarian aid to refugees in Chechnya.

When the IRS questioned Wilcox in June of 2003 about the price of the building as reported on the 2000 tax return, Wilcox said that someone at Al-Haramain-U.S. had prepared the schedule of purchase costs in Quickbooks and that he had just based the purchase price in the tax return on that schedule. At trial, however, Wilcox admitted that he had actually been the one to code the $130,000 withdrawal of travelers checks as related to the building purchase and that he had created the schedule with the erroneous purchase

price. He maintained, however, that the schedule was based on Seda's instructions as to how to categorize the checks.[5]

The parties vigorously debated evidence related to the "money trail." After introducing evidence demonstrating that Al-Buthe cashed the travelers checks in Saudi Arabia and deposited the cashier's check into his own account, the government said that it had followed the money trail as far as it could go and that Al-Buthe's actions were consistent with his misappropriation of some funds and diversion of others to fund the mujahideen. Seda attempted to introduce receipts documenting his transfer of the donation to Al-Buthe, and Al-Buthe's transfer of the donation to Al-Haramain for Chechen relief, but he was unable to authenticate the records.

To establish willfulness, the government called two former members of the Ashland prayer house: David Gartenstein-Ross and Barbara Cabral. Among other subjects, the government questioned Gartenstein-Ross about the distribution of Qur'ans to prisoners, donations made to support Kosovan refugees, and fundraising at the prayer house for two individuals planning to go to Kosovo to fight against the Serbs. Cabral, a convert to Islam who abandoned the religion before trial, described the mosque and prayer services at the Al-Haramain-U.S. prayer house in Ashland as well as Seda's marriage to a Russian-speaking wife. Providing the only direct evidence of Seda's alleged desire to

---

[5] The government also introduced emails between Seda and Al-Haramain's accountant in Riyadh regarding the budget and expenses of Al-Haramain-U.S. Those documents include a spreadsheet sent from the Al-Haramain accountant that records the travelers checks and cashier's check from the El-Fiki donation as going to Al-Buthe. The emails also include desperate pleas from the Al-Haramain accountant to Seda to keep better records.

fund the Chechen mujahideen, Cabral testified that Seda solicited funds for the mujahideen in Chechnya after Cabral and others from Oregon joined Seda in a pilgrimage to Mecca sponsored by Al-Haramain.

In addition to the witnesses from the prayer house, the government introduced a number of exhibits seized in the search, including videos related to the Chechen mujahideen, religious edicts regarding support for the Chechen mujahideen, plus emails Seda received and websites Seda visited about Chechnya. The government also introduced an email from Seda to Al-Buthe titled "What support?" that reproduced an excerpt of a published interview with Chechen mujahideen leader Ul-Khattab stating:

> I'm sorry to say there is not a single Islamic charity organization active inside Chechnya at present. Only the Red Cross is present in Chechen towns and cities. Therefore, we advise the Muslims in the Muslim countries to take a sincere stand with the Mujahideen in the land of the Caucasus.

The government also relied extensively on the testimony of its expert, Evan Kohlmann, who drew connections between Al-Haramain officials and figures such as Ul-Khattab and Osama Bin-Laden. Kohlmann, who had no direct knowledge of the facts of the case, testified, among other things, that the former director of the Saudi Joint Relief Committee through which Al-Haramain provided relief in Chechnya, had been an "old friend" of Bin-Laden's in the 1980s.

At trial, the government frequently referred to a large (3 foot by 4 foot) chart with photographs of Seda and his co-

defendant Al-Buthe, along with a photograph of an Al-Haramain officer in Riyadh who sent out frequent emails about Chechnya, a shadowed cutout of a figure representing Al-Haramain's accountant in Riyadh, and a photograph of the armed mujahideen leader Ul-Khattab, whom Seda did not know and whom Kohlmann had connected to Bin-Laden. The jury also watched a violent video provided by Kohlmann of a training camp for the Chechen mujahideen, which was introduced on the ground that the existence of a still image from the video on Al-Haramain-U.S.'s computers "tended to make it more likely that [Seda] intended that the El-Fiki money end up in the hands of the Chechen mujahideen."

During trial, the government referenced Bin-Laden on five different occasions, including at closing, where the prosecution referred to the director of the Saudi Joint Relief Committee as Bin-Laden's "best friend." The prosecution's arguments repeatedly emphasized the concept of jihad, referring to it thirty-two times over the course of the six-day trial.

The government highlighted Seda's religious activities with Al-Haramain-U.S., including the distribution to prisoners of an edition of the Qur'an (entitled the "Noble Qur'an") supplied by Al-Haramain that contained an appendix called "A Call to Jihad." The prosecution stated at closing:

> The Noble Qur'an is the defendant, after he started working for al-Haramain, sending to U.S. prisons around this country, in the thousands, 10 to 15,000 prisoners, violent people serving time, getting junk like this

from al-Haramain saying jihad is an obligation for Muslims.

After offering this statement, the prosecutor threw or tossed the Qur'an onto a courtroom table in front of the jurors. The government did not mention that Seda worked successfully to have Al-Haramain publish for distribution a new edition of the Noble Qur'an without the inflammatory appendix that the government referenced. The defense made no objection at the time, but now cites the prosecutor's statement as an example of the government's inflammatory rhetoric.

The prosecution also insinuated a connection between Seda and violent jihad:

It [i.e., sending Qur'ans to U.S. prisoners] was a huge project sponsored by al-Haramain Saudi Arabia with their Wahhabi, violent jihad propaganda. They get a foothold in the United States. Pete Seda becomes their man. And out goes this hateful, crazy jihad stuff into prisons.

Seda's witnesses testified, among other things, to Al-Haramain-U.S.'s role as a charity, Seda's good character, and his moderate political and religious beliefs. A former Congregational Church pastor in Ashland related Seda's active participation in Ashland's interfaith and peace communities over the twenty years she was a pastor and his role speaking out at a rally against homophobic violence after the murder of a lesbian couple in Ashland in the 1990s. A local rabbi testified about how Seda in the late 1980s began coming to his synagogue to learn about Judaism, how Seda welcomed students from the synagogue's Hebrew school to

the Ashland prayer house, and how Seda met with the Israeli Consul General in 2002 in an effort to gather support for a charitable relief effort that could bring together Israelis and Palestinians.

The jury convicted Seda of conspiracy to defraud the United States and filing a false return on behalf of a tax exempt organization. He was sentenced to thirty-three months' imprisonment, three years of supervised release, and restitution to the Department of the Treasury of $80,980.

After trial but before sentencing, the government produced reports and notes for twelve previously undisclosed interviews the FBI conducted with government witness Barbara Cabral and her husband Richard Cabral. Among other things, the notes and reports revealed to the defense for the first time that the FBI had paid Richard Cabral $14,500 over the course of the investigation, that at least one of those payments was made in the presence of Barbara Cabral, and that the FBI had made an offer of payment to Barbara Cabral before trial.

Seda filed two separate motions for a new trial: the first motion focused on what he characterized as the prosecution's appeal to prejudice and the second motion, which alternatively sought dismissal of the charges, related to the *Brady* violation. The district court denied both motions.[6]

---

[6] The dissent takes issue with our recitation of the background information. This purported debate over a standard of review is a distraction. If there were a challenge to the sufficiency of the evidence, we would review that challenge drawing all inferences in favor of the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *United States v. Alvarez–Valenzuela*, 231 F.3d 1198, 1201–02 (9th Cir. 2000). But the jury's verdict based on the evidence before it is not at issue. What

## ANALYSIS

### I.   THE *BRADY* CLAIM

As the district court found, "the only direct evidence about [Seda's] desire to fund the mujahideen," came from Barbara Cabral, a witness who the prosecution showcased as critical.  Despite a defense request, the government withheld material, significant, and non-cumulative impeachment evidence about Cabral, including government payments and interview notes.  This *Brady* violation therefore merits a new trial.

FBI Special Agents contacted Cabral and her husband Richard Cabral, members of the Ashland prayer house, shortly after September 11, 2001.  The agents "opened" Cabral as a cooperating witness in 2004 but closed her file in 2006 after deciding that Richard was more likely to be a trial witness.  The FBI re-opened Cabral as a witness in 2008 after Richard passed away.  The FBI interviewed the Cabrals either individually or together twenty times between 2003 and 2010, paid Richard $14,500, and offered Barbara additional financial assistance with medical bills after Richard's death.  An FBI Special Agent told Cabral that he would seek authorization to pay her $7,500.  Before trial, the district court ordered the government to produce exculpatory materials, materials for impeaching potential witnesses, and agent notes.  The government, however, disclosed reports for only eight of the twenty interviews and revealed nothing about payments to either spouse.

---

*is* at issue is whether the appropriate evidence was actually before the jury. We review each of Seda's claims regarding these procedural errors according to the appropriate standard.

Cabral's testimony was the only evidence directly linking Seda to an effort to fund the Chechen mujahideen. Cabral testified that after a Hajj—a pilgrimage to Mecca—that she made with Richard, Seda, and others, Seda asked the group to return to him unused money received from Al-Haramain Saudi Arabia's sponsorship of their Hajj. Cabral quoted Seda as saying the money "would . . . help send blankets and food and help the mujahideen in Chechnya."

After trial, but before sentencing, the government disclosed that it had failed to produce in discovery a significant amount of evidence relating to Cabral. The withheld material documented the previously undisclosed $14,500 in FBI payments to Richard (including a payment for $5,000 made in Barbara's presence) and a separate offer of payment to Barbara Cabral shortly before trial when she was experiencing financial difficulty.[7] The materials additionally included a number of undisclosed reports, draft reports, and notes of multiple interviews with both Cabrals as well as handwritten notes of interviews with Barbara Cabral. The government acknowledged that one of the case agents, a member of the prosecution team, knew all of the relevant details of the suppressed material prior to trial. Seda moved for a new trial.

The district court made several findings with regard to Seda's *Brady* claims. First, the district court found that the withheld information was favorable to Seda because it was

---

[7] One FBI summary of a post-trial interview of Cabral reported her belief that these payments were for the assistance of both Cabrals: "Cabral has always felt the money Richard received from [the FBI] satisfied any monetary consideration that might have been due for her and Richard's help. . . ."

impeachment evidence.  Second, the district court found that the information was in the government's possession and was withheld by the government.   Accordingly, the district concluded that the failure to disclose the information was a discovery violation.

Although the court recognized that "[t]here was some significance to the terrorist issue [i.e., soliciting funds for the mujahideen] because the government ostensibly wanted to establish a reason for the tax fraud," it nevertheless determined that Cabral's testimony was not material to the conviction because "it did not matter where the money fraudulently reported on the tax return actually went and because of other significant evidence regarding willfulness." The court opined that "the government made great significance of the terrorist aspect of the case and presented a great deal of evidence and argument about the mujahideen in Chechnya" but felt that this argument "was collateral to the charges" because Wilcox was the government's key witness. Even though the district court denied Seda's motion for a new trial, it determined that Cabral's testimony was material to the terrorism sentencing enhancement sought by the government because "this was really the only direct evidence about defendant's desire to fund the mujahideen."[8]

The *Brady* standard is familiar:  "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad

---

[8] The district court ultimately did not apply the sentencing enhancement, concluding that "there has been a failure to prove the terrorist enhancement . . . [a] failure to prove a link between the defendant and the money being used for terrorist activities."

faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court emphasized that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Id.*

To establish a *Brady* violation, a defendant must show that: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the government, regardless of whether the suppression was willful or inadvertent; and (3) the evidence is material to the guilt or innocence of the defendant. *See Brady*, 373 U.S. at 87; *see also United States v. Jernigan*, 429 F.3d 1050, 1053 (9th Cir. 2007) (en banc). Although there is no convincing evidence of bad faith on the part of the prosecution, the government concedes, as the district court found, that the withheld information is favorable to Seda and that it should have been turned over before trial. Our *Brady* analysis therefore hinges on materiality.

We review de novo a district court's denial of a new trial motion based on a *Brady* violation. *See United States v. Pelisamen*, 641 F.3d 399, 408 (9th Cir. 2011). Likewise, "the question of 'materiality[]' is a legal matter that we review de novo." *United States v. Price*, 566 F.3d 900, 907 n.6 (9th Cir. 2009); *see also United States v. Oruche*, 484 F.3d 590, 595-96 (D.C. Cir. 2007) ("[O]nce the existence and content of undisclosed evidence has been established, the assessment of the materiality of this evidence under *Brady* is a question of law."). We see no error in the district court's underlying factual findings and, in any event, the level of deference accorded to those findings is not dispositive here.

In evaluating materiality, we focus on whether the withholding of the evidence undermines our trust in the fairness of the trial and the resulting verdict. The touchstone is the "reasonable probability" of a different result, that is, "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citation omitted).

As the Supreme Court has explained, the test of materiality "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434–35. "Consistent with 'our overriding concern with the justice of the finding of guilt,' *United States v. Agurs*, 427 U.S. at 112, a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985). Materiality is defined "in terms of suppressed evidence considered collectively, not item by item." *Kyles*, 514 U.S. at 436.

Here, we zero in on whether the suppressed materials could have provided an effective means of impeachment. This is not a case where the impeachment evidence would have been cumulative or marginal. Rather, as to Cabral, the defense was empty handed at trial precisely because the government did not disclose a substantial amount of relevant information. *See Gonzalez v. Wong*, 667 F.3d 965, 982 (9th Cir. 2011) ("Where the withheld evidence opens up new avenues for impeachment, [even if significant impeachment

evidence was already introduced] it can be argued that it is still material."). Seda consistently denied that he solicited funds for mujahideen after the Hajj, and before trial, Seda moved to exclude Cabral's testimony. Seda's counsel highlighted that "those facts [concerning the request for funds after the Hajj] are contested. We do not believe that that occurred." In response, the government argued strenuously for admission of Cabral's testimony, which it characterized as "critical state of mind, and motive, opportunity evidence." The district court ultimately admitted the testimony, concluding that it was evidence of "motive, opportunity, intent, knowledge, and absence of mistake."

At trial, Cabral presented as a straightforward citizen witness; she had no tawdry or unsavory past and no apparent reason to shade the truth. Of modest means, she worked at J.C. Penney's as a master stylist; her visually impaired husband of thirty-five years had passed away two years before trial. At times relevant to the case, she attended services at the Ashland prayer house, but before trial renounced the Muslim faith. However, because of the suppression, Seda's counsel had virtually no material with which to question her neutrality.

The records of the FBI's payments provide significant impeachment evidence that would have shaded the jurors' perceptions of Cabral's credibility. Although Cabral testified about Seda's motive, Cabral's motive for testifying was left untouched. Payments to a government witness are no small thing. *See Singh v. Prunty*, 142 F.3d 1157, 1162 (9th Cir. 1998) (reversing conviction because of *Brady* violation where key witness received undisclosed "substantial benefits in exchange for his testimony," because "disclosure of an agreement to provide . . . benefits, as well as evidence of the

benefits themselves, could have . . . substantially impeached [the witness's] credibility").

Withheld notes also revealed that Cabral told the case agent that she had been experiencing serious medical issues that left her with several thousand dollars of out-of-pocket medical expenses. The agent responded to this by indicating that the FBI might be able to help her out financially after trial. Although Cabral later said that she did not recall the offer, her relatively modest position and unpaid medical bills would have supported an inference that the FBI payments, together with the offer of possible future payment, were a substantial influence on Cabral's testimony. This inference is particularly strong because of the uncertain nature of the promise. *See Sivak v. Hardison*, 658 F.3d 898, 916 (9th Cir. 2011) ("[W]itnesses have greater incentives to lie if the potential benefits are 'not guaranteed through a promise or binding contract.'") (quoting *Bagley*, 473 U.S. at 683); *Bagley v. Lumpkin*, 798 F.2d 1297, 1302 (9th Cir. 1986) ("The more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor.") (citation omitted).

The payments and notes also would have provided an opening for the defense to highlight significant inconsistencies in the couple's stories. For instance, Richard at different times told the case agents that Seda had identified the intended recipients of the funds collected simply as "the people of Chechnya" and "Chechen refugees," without reference to the mujahideen. The notes also revealed that Cabral erroneously informed the FBI that Seda traveled to Saudi Arabia for a Hajj in 2000. Draft interview summaries revealed additional inconsistencies. For example, one draft summary of an interview with Richard contained the

statement that "[Richard] Cabral did not recall Sedaghaty discussing the topic of Kosovo or supporting mujahedin there" while another draft of the summary excluded that same statement. Another early draft revealed a conflict about the amount of the supposed payments that were collected at the end of the Hajj.

Without the suppressed materials, Seda's counsel was severely limited on cross examination, unable to explore, let alone establish, grounds for Cabral's possible bias. *See United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2005) (recognizing that the defense must be given the opportunity to cross-examine a witness and explore any motive to falsely testify in order to assist government). Taken together with the substantive issues described above, the undisclosed material would have allowed the defense to paint a picture of, at best, a witness whose shaky recollection was influenced by her gratitude to the FBI for its financial assistance; at worst, a witness making up a story to obtain money for medical bills, with the FBI revising its materials to match her anticipated testimony. Either story could have had a substantial impact on the jury.

This conclusion is buttressed by Supreme Court precedent highlighting the importance of witness credibility: "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974) (citation omitted). Where, as

here, important additional grounds for impeachment have been suppressed, we have held that it "would have added an entirely new dimension to the jury's assessment of [the witness]" such that "'there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment [of the evidence]'" *United States v. Kohring*, 637 F.3d 895, 905–06 (9th Cir. 2011) (quoting *Price*, 566 F.3d at 914). Such is the case here.

Although proof of the precise destination of the funds was not essential to the conviction, proof of willful misreporting beyond a reasonable doubt was required. The government's briefing before the district court confirms that "the main issue for the jury was whether the defendant acted willfully in 2000 and 2001 to cover up the true nature of the El Fiki transaction and his [Seda's] knowledge of the intended use of that money by Al Haramain to fund the mujahideen in Chechnya." Cabral's testimony provided the only direct evidence that Seda intended to conceal the transactions and her testimony was therefore crucial to the question of willfulness. The government's other evidence of motive was circumstantial. We emphasize the district court's view: "this was really the only direct evidence about defendant's desire to fund the mujahideen."

"Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who," like Barbara Cabral here, "is critical to the prosecution's case." *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005). It is ironic that when arguing that Cabral should be allowed to testify, the government deemed her "critical" but, in its appeal brief, portrayed her as a "minor witness." The government's attempt to minimize her role because her time on the witness stand was comparatively brief is not persuasive. In fact, the

opposite is true: given the limited scope of her testimony, the only reason to call Barbara Cabral was because her testimony was critical to the crucial point of wilfullness. *See Weiler v. United States*, 323 U.S. 606, 608 (1945) ("The touchstone is always credibility; the ultimate measure of testimonial worth is quality and not quantity.").

Cabral's importance is confirmed by her starring role in the government's closing argument, where the prosecution referred to her testimony four separate times. Discussing jihad and questioning Al-Haramain-U.S.'s status as a charity, the government stated: "Barbara Cabral . . . testified . . . that the defendant went to her and said, 'can we get that money for the mujahideen in Chechnya?'" Addressing the key issue of willfulness, the prosecution turned again to Cabral's testimony: "The willfulness is represented by . . . after the Hajj with Cabral, direct funding [of mujahideen]." The defense also saw Cabral's testimony as sufficiently damaging to raise in its closing argument. Counsel stated: "Was there any call for money to mujahideen after the Hajj? I submit not. I don't think that that is reliable. Bottom line is it is contrary to everything else you know about Pete Seda."

There is also evidence that Cabral's testimony in fact had a significant impact on the jury. Cabral was a particularly sympathetic witness, as a local resident who had converted to Islam when she joined the prayer house Seda led and then later left the faith. The government's other witnesses were either significantly less sympathetic, had no direct knowledge of Seda, or were shown by the defense to have possible bias or ulterior motives. Cabral appeared to be the government's only disinterested witness who was actually close to Seda, and she testified in a terrorism-tinged prosecution about an effort to help Muslim guerilla combatants. Notably, as

Cabral was leaving the witness stand after completing her testimony, one of the jurors whispered a compliment to her on her testimony. The juror was excused, but the fact that the juror complimented Cabral's testimony underscores her impact as a witness.

The prosecution's earlier description of Cabral's testimony as "critical" only confirms this conclusion. *Kyles,* 514 U.S. at 444 ("The likely damage [of suppressed evidence] is best understood by taking the word of the prosecutor . . . ."). Viewing the suppressed evidence holistically in light of the other evidence, the withheld evidence "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678. We conclude that Cabral's testimony was important enough that a changed perception of her credibility creates a reasonable probability of a different verdict. *See United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986) (noting that where a witness's testimony "was critical to . . . conviction, the jury's assessment of . . . credibility was crucial to the outcome of the trial."). In light of the "importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case," Seda has established a *Brady* violation that merits a new trial. *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir. 1993).

## II.  CIPA CLAIMS

Although this is a tax fraud case, the prosecution discovered that the government possessed some relevant classified information, which was handled under CIPA procedures. Those procedures endeavor to harmonize a defendant's right to a fair trial with the government's right to protect classified information. *See United States v. Abu-*

*Jihaad*, 630 F.3d 102, 140 (2d Cir. 2010). While the government must safeguard classified information in the interest of national security, "courts must not be remiss in protecting a defendant's right to a full and meaningful presentation of his claim to innocence." *United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990).

The government filed six motions seeking protection for classified materials, all of which were granted by the district court. Seda challenges the court's handling of these classified matters, including its approval of an unclassified summary, the use of ex parte proceedings, and the restriction on defense counsel's use of classified material that the defense had placed in safekeeping.

## A.  CIPA PROVISIONS

Congress enacted CIPA in 1980 "to help ensure that the intelligence agencies are subject to the rule of law and to help strengthen the enforcement of laws designed to protect both national security and civil liberties." S. Rep. No. 96-823, at 3 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4294, 4296. CIPA does not expand or restrict established principles of discovery and does not have a substantive impact on the admissibility of probative evidence. *United States v. Johnson*, 139 F.3d 1359, 1365 (11th Cir. 1998); S. Rep. No. 96-823 at 8, *reprinted in* 1980 U.S.C.C.A.N. at 4301–03. Instead, CIPA "establishes procedures for handling classified information in criminal cases," *United States v. Aref*, 533 F.3d 72, 78 (2d Cir. 2008), so that district courts may rule "on questions of admissibility involving classified information before introduction of the evidence in open court," *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) (citation omitted). Two sections of CIPA are relevant here: § 4

governs the pretrial discovery of classified information by defendants, and § 6 sets out procedures to safeguard classified information, both before and during trial.

CIPA § 4 was intended "to clarify the court's powers under Fed. R. Crim. P. 16(d)(1) to deny or restrict discovery in order to protect national security."[9] *Sarkissian*, 841 F.2d at 965; S. Rep. No. 96-823 at 6, *reprinted in* 1980 U.S.C.C.A.N. at 4299. Section 4 provides that:

> [t]he court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove.

18 U.S.C. app. 3 § 4.

---

[9] Federal Rule of Criminal Procedure 16(d)(1) provides that:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1).

When considering a motion to withhold classified information from discovery, a district court must first determine whether, pursuant to the Federal Rules of Criminal Procedure, statute, or the common law, the information at issue is discoverable at all. *United States v. Rewald*, 889 F.2d 836, 847–48 (9th Cir. 1989). If the material at issue is discoverable, the court must next determine whether the government has made a formal claim of the state secrets privilege, "'lodged by the head of the department which has actual control over the matter, after actual personal consideration by that officer.'" *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998) (quoting *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953)). Once a court concludes that the material is discoverable and that the state secrets privilege applies, then the court must determine whether the evidence is "relevant and helpful to the defense of an accused." *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957); *United States v. Gurolla*, 333 F.3d 944, 951 (9th Cir. 2003). If the information meets the "relevant and helpful" test, CIPA § 4 empowers the court to determine the terms of discovery, if any. 18 U.S.C. app. 3 § 4.

CIPA § 6, which applies to both pre-trial and trial proceedings, guides the procedures for making "determinations concerning the use, relevance, or admissibility of classified information. . . ." 18 U.S.C. app. 3 § 6(a). Specifically, CIPA § 6(c)(1) deals with substitutions and provides that a court may authorize a substitution for classified material in the form of a statement or summary "if it finds that the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C. app. 3 § 6(c)(1). This requirement arises out of the Constitution's guarantee that all criminal

defendants must have "'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). Indeed, the "need to develop all relevant facts in the adversary system is both fundamental and comprehensive." *United States v. Nixon*, 418 U.S. 683, 709 (1974).

The substitution need not be of "precise, concrete equivalence," and the "fact that insignificant tactical advantages could accrue to the defendant by the use of the specified classified information should not preclude the court from ordering alternative disclosure." H.R. Rep. No. 96-1436, at 12-13 (1980) (Conf. Rep.), *reprinted in* 1980 U.S.C.C.A.N. at 4310–11. Nevertheless, the fundamental purpose of a substitution under CIPA is "to place the defendant, as nearly as possible, in the position he would be in if the classified information . . . were available to him." *United States v. Moussaoui*, 382 F.3d 453, 477 (4th Cir. 2004); *see also United States v. Rezaq*, 134 F.3d 1121, 1143 (D.C. Cir. 1998) (approving substitutions where "[n]o information was omitted from [them] that might have been helpful to [the] defense, and the discoverable documents had no unclassified features that might have been disclosed").

## B.  THE SUBSTITUTION

The government acknowledged in advance of trial that it had classified information that was helpful to Seda's defense. The government proposed, and the court authorized, the following unclassified summary of classified material responsive to Seda's discovery requests:

The U.S. Government obtained information that Sami 'Abd Al 'Aziz Al-Sanad worked during 2000 and 2001 for the Al-Haramain organization and was responsible for providing currency supplied by Al-Haramain, including the currency obtained by codefendant Soliman Al-Buthe from Al-Haramain USA, to a representative of Muhammad Al-Sayf, aka Abu Umar, to be smuggled into Chechnya. Al-Sanad has claimed that the monies he provided to Al-Sayf's representative were destined for needy Chechen families.

Seda objected to the substitution and asked either for "an uneditorialized summary" or for the production of the underlying material. After careful review of the materials at issue, we conclude that the substitution's language unfairly colored presentation of the information and, even more problematic, that the substitution omitted facts helpful to Seda's defense. Further detail and analysis of the substitution is contained in the classified opinion with respect to the substitution. The substitution is statutorily inadequate because it does not provide Seda with "substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C. app. 3 § 6(c)(1).

The brief summary contains both inculpatory and exculpatory information. On the one hand, it supports the government's theory that the El-Fiki donation went to fund the mujahideen in Chechnya because it indicates that Al-Sanad gave the money to a representative of Al-Sayf, who the government established at trial was a religious leader associated with the Chechen mujahideen at the time. On the

other hand, it supports Seda's claim that, as far as he knew, the donation was to be used to fund humanitarian relief.

The wording of the summary bolsters the inculpatory section while discrediting the exculpatory section. For example, the first sentence presents Al-Sanad's transfer of the El-Fiki donation to Al-Sayf's representative as a fact about which the government has "obtained information." The second sentence, by contrast, embeds skepticism into Al-Sanad's exculpatory statement about the destination and use of the funds, dismissing it as something Al-Sanad "has claimed." This is but one example of the neutrality deficiencies in the statement. It is no surprise that Seda ultimately chose not to use the substitution at trial.

Because the underlying documents are classified, we are constrained in our comments about the summary. But it is a fundamental principle underlying CIPA that the summary should be evenhanded, worded in a neutral fashion and not tilted or shaded to the government's advantage. *See* S. Rep. No. 96-823 at 9 (1980), *reprinted in* 1980 U.S.C.C.A.N. at 4302-03 (stating that the "judge should ensure that a substitution . . . is crafted so that the Government obtains no unfair advantage in the trial").

In isolation, the characterization of the evidence may not be a sufficient basis to reject the substitution. More troubling, however, is the exclusion from the summary of further information that is helpful to Seda's defense. The classified nature of the material highlights the awkward nature of our review: Seda is forced to argue for the relevance of the material without actually knowing what the classified record contains, while we know what it contains but are unable to describe it on the public record. *See United States*

*v. Amawi*, 695 F.3d 457, 471 (6th Cir. 2012) (without the benefit of "the adversarial process, we must place ourselves in the shoes of defense counsel, the very ones that cannot see the classified record, and act with a view to their interests") (citation omitted).[10]  We can say, however, that the summary excludes exculpatory information and fails to provide crucial context for certain information that it does convey.

Although there is no indication of bad faith, the government appears to have looked with tunnel vision at limited issues that it believed were relevant.  Even granting the district court wide latitude in its evidentiary decision-making, as we must, we conclude that the summary is inadequate not only because of its slanted wording but more fundamentally because it is incomplete.  *United States v. Clegg ("Clegg I")*, 740 F.2d 16, 18 (9th Cir. 1984) (upholding rejection of a substitution where the classified documents "are relevant to the development of a possible defense" and the "government's proposed summaries of the materials are inadequate").  It would be illogical to conclude that a substitution that excludes non-cumulative exculpatory information could "provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information" as required by CIPA § 6. 18 U.S.C. app. 3 § 6(c)(1); *see also Moussaoui*, 382 F.3d at 478–79 (rejecting proposed substitutions that failed to include exculpatory information); *Fernandez*, 913 F.2d at 158 (upholding rejection of proposed substitutions because the "substitutions would have required the jury to judge [the defendant's] role . . . , and thus the truth of his statements about it, in a contextual vacuum").

---

[10] The defense did file an ex parte submission outlining its theory of the defense to aid the court in its review of the classified material.

The dissent attempts to minimize the importance of the substitution by taking the position that the evidence would be inadmissible hearsay and that Seda waived his objection to the substitution. The dissent overlooks the most important fact about the substitution's admissibility—the government agreed to stipulate to its admission at trial. The government did not argue that the substitution was hearsay or otherwise inadmissible. Rather, recognizing that it was in a difficult position with respect to the possession of exculpatory information and Seda's right to a fair trial, the government made the calculated move to agree to stipulate to the admission of the substitution as a trial exhibit. Not surprisingly, in the face of a slanted and unhelpful summary, Seda's counsel ultimately withdrew the substitution as a stipulated exhibit just before trial. But defense counsel ought not be put in a Catch-22 situation whereby it has to accept the government's deficient summary or none at all.

The dissent also manufactures an argument not presented by the government—that Seda waived his objections to the substitution.[11] On August 20, 2010, Seda filed objections to the summary substitution and moved for "an uneditorialized summary." Without being able to access any of the underlying documents, Seda objected that the summary omitted relevant and helpful information about the individual to whom Al-Sanad transferred the funds. He also objected to the fact that the summary included language that questioned Al-Sanad's veracity and argued that the defense should be entitled to offer the exculpatory statements actually provided by Al-Sanad. Alternatively, Seda moved for access to more complete unclassified versions of the underlying materials on

---

[11] The government simply replied to Seda's objections on the merits.

which the summary was presumably based. Seda never withdrew or waived this objection.

At a hearing the week before trial, the defense reiterated its objections to the summary substitution. The government replied that it would stipulate to the admission of the summary, but would not revise or alter it, saying, "we think it's either all or nothing." In response, the court said only, "Okay," and moved on to another topic. Later in that same hearing, as the judge was making final rulings on the exhibits, the government reiterated its position with regard to the summary and stated that the only decision was whether the defense wanted to accept the summary in its current form or not. The defense responded, "At this time, Your Honor, we would not be offering it. *We've pointed out what we believe needs to be done.*" (emphasis added). The defense withdrew the exhibit in that form, at that time, but explicitly referenced and reiterated its objection. Seda did not withdraw or waive his objection to the court's approval of the government's summary substitution. Nor could Seda's counsel have been expected to offer an intelligent substitution or alternative language, since he did not have access to the underlying classified documents. Having been unsuccessful at challenging the substitution before trial, Seda's recourse is in this appeal.

We are fully cognizant of the delicate task entrusted to the district court in matters involving classified information. To that end, CIPA lays out a defined process for substitutions such that, when classified information is relevant and helpful to his defense, the defendant should be placed, "as nearly as possible, in the position he would be in if the classified information were available to him." *Moussaoui*, 382 F.3d at 477; *see also*, 18 U.S.C. app. 3 § 6(c)(1). In the end, the

inadequate substitution interfered with Seda's ability to present a complete defense. Although the government argues that substitution was sufficient, it does not make any argument that the facts omitted are harmless. *See United States v. Boulware*, 384 F.3d 794, 898 (9th Cir. 2004).

## C. OTHER CIPA CLAIMS

Seda raises four other claims related to CIPA: the ex parte nature of many of the CIPA proceedings; the potential withholding of additional classified information that is relevant and helpful to the defense; the exclusion of a classified document in his counsel's possession; and the claim that classified evidence reveals the search warrant was prompted by prior illegal surveillance.

### 1. Ex Parte Proceedings

Seda's broadside challenge to the in camera and ex parte proceedings is a battle already lost in the federal courts.[12] Long ago we underscored that "[e]x parte hearings are generally disfavored," but held that "[i]n a case involving classified documents, however, *ex parte*, *in camera* hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use in order to decide the relevancy of the information." *Klimavicius-Viloria*, 144 F.3d at 1261.

---

[12] Seda moved to strike the classified, ex parte appellate briefs and excerpts of record filed by the government or, in the alternative, to request access for his security-cleared counsel and expert to the documents. We denied the motion for the same reasons discussed below with regard to the requirements of CIPA. We reviewed the classified briefs and excerpts of record from both parties.

Seda especially protests three occasions during trial in which the court held closed hearings with cleared counsel for both parties and then excused defense counsel and met ex parte with the prosecutors.**[13]** These brief ex parte hearings, which directly followed the hearings with defense counsel, were held at the court's request to clarify issues related to the court's prior CIPA rulings. CIPA does not limit the court's discretion to hold an ex parte conference if it is required by some overriding necessity such as the necessity to protect sensitive information related to national security, as it was here. *See United States v. Thompson*, 827 F.2d 1254, 1258 (9th Cir. 1987) (recognizing that "situations where the court acts with the benefit of only one side's presentation are uneasy compromises with some overriding necessity, such as the need to act quickly or to keep sensitive information from the opposing party").

Apart from his general objections to the ex parte proceedings, Seda claims that he should have received more fulsome notice of the subject of the filings and that his security-cleared counsel should have had access to the classified documents in discovery. The government filed six notices informing Seda that it had filed in camera, ex parte submissions to the court. All of these notices apprised Seda that the submissions were filed pursuant to CIPA § 4, thus notifying him that the government requested authorization from the court to withhold items from discovery that were not relevant and helpful to Seda's defense.

---

**[13]** For whatever reason, the docket sheet does not reflect these closed hearings. The hearings should have been docketed but the failure to do so is harmless in light of defense counsel's knowledge of the hearings and the fact that the transcripts are available for appellate review.

Seda is of the view that the failure of the notices to describe in unclassified terms the nature of what had been provided to the court makes the filings inadequate. Both Federal Rule of Criminal Procedure 16(d)(1) and § 4 of CIPA, however, explicitly provide for ex parte filings and do not require that detailed notice of the content of the filing be provided. Fed. R. Crim. P. 16(d)(1) ("The court may permit a party to show good cause by a written statement that the court will inspect ex parte."); 18 U.S.C. app. 3 § 4 ("The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone."). The notices complied with CIPA and were constitutionally adequate—Seda has no due process right to receive a description of materials in the government's possession that are not discoverable.[14] *See United States v. Mejia*, 448 F.3d 436, 458 (D.C. Cir. 2006) (noting that, in the context of CIPA, as in other discovery in criminal cases, the defendant is "'not entitled to access to any of the evidence reviewed by the court . . . to assist in his argument' that it should be disclosed") (citation omitted). Similarly, the simple fact that defense counsel held security clearances does not mean that the attorneys were entitled to access the government's classified filings. *See United States v. El-Mezain*, 664 F.3d 467, 568 (5th Cir. 2011) (approving, in the context of the Foreign Intelligence Surveillance Act, denial of discovery to cleared defense counsel because of the government's substantial interest in maintaining secrecy).

---

[14] For the limited material that was discoverable, CIPA § 4 allows the government to either turn over the original material or create an adequate substitution. 18 U.S.C. app. 3 § 4. An adequate substitution obviates the need for counsel to access the underlying classified material itself (although the government may share it with security-cleared defense counsel to craft an appropriate substitution if the nature and classification of the material permits and the government so chooses).

In sum, the ex parte proceedings were authorized by CIPA, Federal Rule of Criminal Procedure 16(d)(1), and the compelling justification and overriding necessity required by common law. The proceedings did not violate Seda's rights. Our careful review of the classified record confirms that all of the classified filings and transcripts of all of the hearings, including the classified ex parte hearings, have been preserved and made available to us on appeal. The district judge, now retired, was meticulous in his review of the classified material.

## 2. Relevant and Helpful Information

The district court did not improperly withhold relevant and helpful information from discovery under CIPA § 4 or Federal Rule of Criminal Procedure 16(d)(1). *See Gurolla*, 333 F.3d at 951. We have reviewed the government's classified submissions in their entirety. The bulk of the information the government sought to withhold was not discoverable. Apart from the classified material underlying the inadequate substitution discussed above, those few items that were discoverable were not relevant and helpful to the defense. The defense provided an analysis by Colonel Lang, former head of Human Intelligence for the Department of Defense. Although we credit Colonel Lang's experience and expertise, his speculation concerning the documents (to which he did not have access) is just that.

## 3. Classified Material in Seda's Possession

Before trial, Seda's counsel came into possession of a classified document. Counsel took appropriate steps to safeguard access and negotiated an agreement to turn the material over to a Classified Information Security Officer for

placement in a secure facility in Washington, D.C. After the district court issued what Seda terms a "gag order"—prohibiting counsel from referencing or disclosing the document—Seda sought reconsideration of that order six times. Seda's counsel also gave notice under CIPA § 5 of its intent to use the classified information at trial. The district court reviewed the material in camera, determined that the material was not relevant to the charges, and denied reconsideration of the protective order.[15] Upon reviewing the document and the district court's in camera determinations with a fresh eye, we affirm the district court's determination and conclude that there was no violation of CIPA §§ 5–6. *See Rewald*, 889 F.2d at 847–48 ("[W]e decline [the defendant's] invitation to undertake an all-encompassing analysis of this issue, and simply confine our review to the relevancy and admissibility of the classified materials. . . .").

The district court's limited protective order did not violate Seda's right to counsel or his right to present a defense. *See Moussaoui*, 591 F.3d at 289 ("The right to communicate with counsel at any point in the proceedings is not absolute."). The order was justified by compelling national security concerns and the restrictions were limited to a single document that was not relevant to the charges. *See Morgan v. Bennett*, 204 F.3d 360, 367 (2d Cir. 2000) ("[T]he court should not, absent an important need to protect a

---

[15] Seda also raises a concern that government attorneys or agents participated in the district court's review of the material that was placed in the secure facility. The records and representations of the Classified Information Security Officers entrusted with the material reflect that no one has accessed the documents except the court and the Classified Information Security Officer on one occasion, and the defense counsel together with the Classified Information Security Officer, on another occasion.

countervailing interest, restrict the defendant's ability to consult with his attorney, but . . . when such a need is present and is difficult to fulfill in other ways, a carefully tailored, limited restriction on the defendant's right to consult counsel is permissible.").

### 4.  Fruits of Unlawful Surveillance

Seda speculates that the classified materials contain evidence of prior unlawful surveillance that led to the search warrant application.  The record does not support a claim of taint.  *See Murray v. United States*, 487 U.S. 533, 542 (1988). The affidavit attached to the warrant detailed the investigation that established probable cause for the search. The investigative interviews, grand jury subpoenas, and other lawful investigative techniques that made up that investigation were the legitimate basis for the decision to seek the warrant.

## III.    SEIZURE BEYOND THE SEARCH WARRANT

Government agents searched Seda's home in 2004 pursuant to a valid search warrant authorizing the seizure of a limited set of documents: financial records and communications related to the preparation of the 2000 tax return.  The government emerged from the search, however, with much more: news articles, records of visits to various websites about Chechnya, photographs of Chechen war scenes, and other documents that were introduced at trial as evidence of Seda's desire to fund the Chechen mujahideen.

The Fourth Amendment famously protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S.

Const. amend. IV. To effectuate this right, it provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* The question we consider de novo is whether the search was unreasonable because agents relied on the affidavit in support of the warrant to expand the authorized scope of items detailed in the warrant itself. *See United States v. Hurd*, 499 F.3d 963, 965 (9th Cir. 2007) (considering whether a search is within the scope of a warrant is a question of law reviewed de novo).

The search warrant incorporated two attachments (A and B) and an affidavit supporting probable cause for the search. *See United States v. SDI Future Health, Inc.*, 568 F.3d 684, 699–701 (9th Cir. 2009) ("A warrant expressly incorporates an affidavit when it uses 'suitable words of reference.'") (quoting *United States v. Towne*, 997 F.2d 537, 545 (9th Cir.1993)). The affidavit described Al-Haramain-U.S. and its structure, detailed facts about the El-Fiki donation, Al-Haramain-U.S.'s purchase of the Ashland and Springfield prayer houses, and inconsistencies on the 2000 tax return. The affidavit also included background information from news articles about the conflict in Chechnya, investigations into connections between several Al-Haramain branches and the funding of terrorism, and statements of Al-Haramain's former director about funding for the Chechen mujahideen.

Attachment A described the location of Seda's home (also Al-Haramain-U.S. headquarters). Attachment B listed five

individuals and five entities associated with the violations and it detailed the items to be seized:[16]

> *Evidence Relating to the Tax Violation*
>
> Evidence concerning the subscription to a false Form 990 Tax Return, in violation of Title 26, United States Code, Section 7206(1), as described in the attached affidavit, for the year 2000, *limited to the following*:
>
> Records and communications, including electronic records and communications involving the individuals or entities above, pertaining to the preparation of an IRS Form 990 for the year 2000;
>
> Records relating to bank accounts, bank transactions, bank records, safe deposit records, asset purchases or sales, other financial transactions, and donor and donee lists, involving the year 2000 which relate to the individuals or entities above; and

---

[16] The five individuals listed were: Pirouz Sedaghaty, Soliman Al-Buthe, Aqeel Al-Aqeel, Mansour Al-Kadi, Mahmoud Talaat El-Fiki. The five entities listed were: Al Haramain; Al Haramain Foundation; Al Haramain Islamic Foundation, Inc.; Al Haramain Headquarters aka Al Haramain Riyadh.

Records relating to credit card accounts, records, and transactions involving the year 2000, which relate to the individuals or entities above.

(emphasis added).[17]

The warrant contained similar language for the currency reporting (CMIR) violation, expressly limiting the evidence seizure to "records of financial transactions and communications" between October 1997 and February 2003 pertaining to the same named individuals and entities. Neither Attachment A nor B referenced Chechnya or the mujahideen.

Attachment B also permitted the government to review computer equipment to determine whether it would be practical to search or copy it on site and, if not, allowed the government to remove the computers in order to "extract and seize any data that falls within the list of items to be seized" described above. Attachment B required the government to return any data outside of that list within sixty days.

Agents removed nine computers from the house, and computer forensic experts used an evolving list of search terms to comb through the computers for useful materials. In addition to financial records and communications describing the preparation of the tax return, the agents seized hundreds of other items, including internal Al-Haramain-U.S. organizational documents, news articles, records of internet

---

[17] The dissent selectively quotes from the warrant to support its broad reading. In fact, the plain language of the warrant explicitly limits the items to be seized more narrowly.

access to various websites about Chechnya, webpages sent to Al-Haramain-U.S. by various listservs, photographs of Chechen war scenes, and articles about Seda's civic life. Seda moved to stop the searches of electronic media and to suppress the evidence that was beyond the scope of the warrant.[18]

The district court denied Seda's motion, reasoning that the "crimes charged require proof of intent and thus records beyond simple financial records were appropriately seized, such as evidence of support of the efforts of the Chechnyan mujahideen." The district court cited *SDI Future Health*, 568 F.3d at 699, for the proposition that an affidavit incorporated in the warrant is "potentially curative of any defects."

Without doubt, the warrant references the affidavit, but the question is to what effect. The plain meaning of the text provides the answer: the warrant seeks "evidence concerning the" tax and currency reporting violations "described in the attached affidavit." The affidavit describes in separate sections both the willful filing of a false return and the CMIR violations, along with the requirements for each and evidence supporting probable cause for the search. Adopting the commonsense reading that the affidavit was incorporated for the specific purpose of describing the offenses and establishing probable cause does not require a hyper-technical parsing of the language.

---

[18] Seda consistently argued that the seizure was unlawful because it exceeded the scope of the warrant. At oral argument, Seda's counsel argued that the seizure exceeded the warrant's scope even if the affidavit was incorporated into the warrant.

The plain text of the warrant likewise clearly delineates what is to be seized. Under the heading "ITEMS TO BE SEIZED," Attachment B states that "[e]vidence concerning the" tax violation is "limited to the following," and then discusses tax documents, financial records, and associated communications "pertaining to the preparation of an IRS Form 990 for the year 2000." "Evidence concerning the" CMIR charge is similarly limited to records of financial transactions and associated communications between the listed individuals from 1997 to 2003. The only reference in the affidavit to the evidence sought is the concluding request for authorization to search "for the evidence listed in Attachment B and to seize the same." Therefore, there is no reason to read the affidavit as defining the scope of the items to be seized. Instead, that list is contained in Attachment B to the warrant.[19]

Even if the affidavit is understood to describe evidence "relevant" to the violations, that does not authorize the far flung scope of the agents' search. Relevance, of course, is not the standard; the language of the warrant controls. *United States v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982) ("As a

---

[19] The affidavit, in fact, is consistent with a limited authorization focusing on financial records and communications pertaining to the 2000 tax return and the CMIR: in describing documents likely to be found at Al-Haramain-U.S.'s Ashland office in order to establish probable cause for the search, it lists "financial records" such as "correspondence, receipts, negotiated instruments, contracts, bank statements and other records," plus documentation concerning "income, expenses, asset purchases, communications with tax preparers and other officers." The affidavit specifically references an interest in "transaction details from the organization's Quickbooks program for the 1999 and 2000 years." The magistrate judge could not have known from the affidavit that the agents instead intended to seize records of Seda's internet browsing of religious websites or his correspondence with friends and co-workers.

general rule, in searches made pursuant to warrants only the specifically enumerated items may be seized.") (citation omitted). The warrant was expressly limited in scope and did not include items such as the records of visits to websites about Chechnya, the communications unrelated to the preparation of the tax return with individuals never named or referenced in the affidavit, or the general background information about the Chechen mujahideen that were seized. The dissent suggests that all of this evidence is necessary to establish the required *mens rea*. But it is not authorized by the warrant. Upon failing to find evidence of willfulness in the records pertaining to the preparation of the tax return that were authorized to be seized, the government should not be able to comb through Seda's computers plucking out new forms of evidence that the investigating agents have decided may be useful, at least not without obtaining a new warrant. *See United States v. Heldt*, 668 F.2d 1238, 1266 (D.C. Cir. 1981) ("[T]he particularity requirement of the fourth amendment prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.") (internal quotation marks and citation omitted). In light of the specific limitations of the warrant, it is difficult to embrace the government's justification that the search terms "bore a logical connection to the affidavit" and that all of the materials seized "were relevant given the nature of the charges."

To adopt the government's approach would permit a kitchen sink probable cause affidavit to overrule the express scope limitations of the warrant itself. The issue here is not whether the warrant incorporated the affidavit. That is not in doubt—instead the issue is the scope of the reference. May a broad ranging probable cause affidavit serve to expand the

express limitations imposed by a magistrate in issuing the warrant itself? We believe the answer is no. The affidavit as a whole cannot trump a limited warrant.

Our cases have not dealt with this situation directly. Rather, we have considered cases in which an affidavit could cure a defective warrant. That circumstance has arisen when there is a clerical error or when the warrant is overbroad but could be cured by a particularized affidavit. *Towne*, 997 F.2d at 544 (affirming the "well-settled principle that a warrant's overbreadth can be cured by an accompanying affidavit that more particularly describes the items to be seized") (citation omitted); *United States v. Bowler*, 561 F.2d 1323, 1326 (9th Cir. 1977) (holding that the presence of the correct address in the sworn affidavit could correct a typographical error in the warrant). Here, however, there is no error in the warrant for the affidavit to cure. The error is with the seizure, which exceeded the warrant's scope. *See United States v. Angelos*, 433 F.3d 738, 746 (10th Cir. 2006) (noting that "it is apparent that the problem lies in the execution, and not the constitutionality, of the search warrant"). We have never held that an affidavit could expand the scope of a legitimate warrant beyond its express limitations nor do we do so here.

Our approach accords with the D.C. Circuit's treatment of a warrant in *United States v. Kaye*, 432 F.2d 647, 649 (D.C. Cir. 1970): "It is the description in the search warrant, not the language of the affidavit, which determines the place to be searched." The same principle—that it is the warrant and not the affidavit that controls—applies equally to the items to be seized. The court in *Kaye* explicitly rejected the argument that "the scope of the search warrant was determined or broadened by the . . . supporting affidavit." *Id.; see also Angelos*, 433 F.3d at 746 (concluding that a

search congruent with the affidavit but beyond the explicit terms of the warrant exceeded the warrant's scope).

This approach is also supported by the Third Circuit's decision in *Doe v. Groody*, 361 F.3d 232, 240 (3d Cir. 2004). Although the affidavit in *Groody* was not incorporated into the warrant, the court reasoned more generally that while an affidavit can be used to cure an otherwise overbroad warrant by narrowing its scope, an affidavit cannot be relied upon to authorize a search beyond the scope of a judicially authorized warrant. *Id.* at 241. ("Bluntly, it is one thing if officers use *less* than the authority erroneously granted by a judge [by relying on an affidavit to narrow the warrant]. It is quite another if officers go *beyond* the authority granted by the judge.") (emphasis added). Indeed, "the warrant provides the license to search, not the affidavit." *Id.*

The supervising agent here may well have believed that the affidavit took precedence over the warrant, but the subjective state of mind of the officer executing the warrant is not material to our initial inquiry. *United States v. Ewain*, 88 F.3d 689, 694 (9th Cir. 1996) ("A policeman's pure heart does not entitle him to exceed the scope of a search warrant . . . ."). Any other conclusion would elevate the author of the incorporated probable cause affidavit over the judge issuing the warrant. *Cf. Johnson v. United States*, 333 U.S. 10, 13–14 (1948) (noting that the Fourth Amendment requires that any inferences from the evidence be "drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime").

The district court determined that the "fact that a further warrant was requested when information possibly relating to

a separate crime was discovered belies the allegations that the search was a general fishing expedition." That may be. But the fact that the government sought a separate warrant for *some* materials outside the scope of the warrant does not somehow countenance the seizure of other materials outside its scope. *Cf. United States v. Crozier*, 777 F.2d 1376, 1381 (9th Cir. 1985) ("A search must be limited to the terms of the warrant."). To the extent the agents wanted to seize relevant information beyond the scope of the warrant, they should have sought a further warrant.

The Supreme Court has emphasized that "there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers" as opposed to physical objects, and that given the danger of coming across papers that are not authorized to be seized, "responsible officials, including judicial officials, must take care to assure that [searches] are conducted in a manner that minimizes unwarranted intrusions upon privacy." *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976). The search warrant here was properly issued and clearly stated the locations to be searched and the items that could be seized. The government agents responsible did not minimize intrusions on privacy, however, but instead seized papers and records beyond those the warrant authorized. *See United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978) (concluding that although the warrant was sufficiently particular, the executing "agents did not confine their search in good faith to the objects of the warrant, and that while purporting to execute it, they substantially exceeded any reasonable interpretation of its provisions" ). Unlike cases where the magistrate judge erred in filling out the warrant but the government reasonably relied on the judge's approval, here the magistrate judge properly authorized the warrant but

the agents did not follow it. *See Hurd*, 499 F.3d at 969 (holding that officers reasonably relied on the warrant, though judge inadvertently failed to initial the appropriate line); *United States v. Hitchcock*, 286 F.3d 1064 (9th Cir. 2002) (determining that magistrate's error in post-dating one line of the warrant did not require suppression of the evidence seized).

The government's seizure of items beyond the terms of the warrant violated the Fourth Amendment. In the absence of "flagrant disregard for the terms of the warrant," a district court need not "suppress all of the evidence, including evidence that was not tainted by the violation." *United States v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992) (internal quotation marks omitted). "Th[e] extraordinary remedy [of suppressing evidence seized within the scope of the warrant] should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search." *Id.*

Because the record does not reflect a flagrant general search, we reject Seda's contention that the violation requires suppression of *all* of the evidence seized. However, the exclusionary rule generally bars admission of the evidence seized that was beyond the scope of the warrant. *See United States v. Payton*, 573 F.3d 859, 864 (9th Cir. 2009) (reversing conviction where "search of [defendant's] computer without explicit authorization in the warrant exceeded the scope of that warrant"). The illegal seizure of this evidence was not without consequence, as much of the illegally seized evidence was admitted to bolster the government's theory that Seda sympathized with and sought to aid the mujahideen. *Cf. Tamura*, 694 F.2d at 597 (declining to order a new trial where, despite unlawful seizure of items outside the scope of

the warrant, "[a]ll of the documents introduced at trial were seized and retained lawfully because described in and therefore taken pursuant to the valid search warrant").

The district court erroneously concluded that the items seized were within the scope of the warrant, and thus did not consider the applicability of the exclusionary rule. Nor did the parties brief this issue on appeal. For this reason, we part company with the dissent and conclude that it is not appropriate for us to make the initial determination of good faith on appeal. On remand, the district court should determine in the first instance which specific items seized can be understood to be "records or communications pertaining to the preparation of an IRS Form 990 for the year 2000" or otherwise authorized by Attachment B and whether the seizure of items beyond that scope implicates the principles of *United States v. Leon*, 468 U.S. 897 (1984), and *Herring v. United States*, 555 U.S. 135, 140–48 (2009).

## IV. OTHER CLAIMS

### A. EVIDENTIARY ISSUES

#### 1. Receipts

In 2004, Seda turned over a number of records to the government, including four receipts. Seda claimed that two of those receipts recorded his transfer of the El-Fiki donation to Al-Buthe (termed AHIF-2 and AHIF-3) and the other two receipts recorded Al-Buthe's transfer of the donation to Al-Haramain in Riyadh (rejected defense exhibits 704 and 705). Seda was unable to authenticate any of these four exhibits.

The district court properly excluded exhibits 704 and 705 because they were unauthenticated. Fed. R. Evid. 901; *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("[a]uthentication is a condition precedent to admissibility") (internal quotation marks and citation omitted). At trial, the government introduced the other receipts—AHIF-2 and AHIF-3—through multiple witnesses, not for their substance, but so it could argue the receipts were fabricated. The district court's admission of these exhibits "not for their truth" but to corroborate the fabrication theory, was not an abuse of discretion nor did it deprive Seda of a fair trial. The hearsay rule does not apply to evidence offered "to establish a foundation for later showing, through other admissible evidence, that it was false." *See United States v. Knigge*, 832 F.2d 1100, 1108 (9th Cir. 1988) (quoting *Anderson v. United States*, 417 U.S. 211, 220 (1974)). Contrary to Seda's assertion, the limited admission of these receipts did not preclude him from arguing his theory to the jury.

## 2.  Distortion of the Fact-Finding Process

Seda claims that he suffered from an uneven playing field because the government used its resources to obtain foreign evidence that was inculpatory but failed to assist him in obtaining exculpatory evidence, specifically bank records from Saudi Arabia and depositions from Egypt. The net result was, according to Seda, a distortion of the evidence. Seda analogizes his case to *United States v. Westerdahl*, 945 F.2d 1083, 1086 (9th Cir. 1991), in which we held that even though a defendant may not compel the government to offer use immunity to a witness, intentional distortion of the fact-finding process by denying immunity may constitute prosecutorial misconduct. *See also United States v. Straub*,

538 F.3d 1147, 1160 (9th Cir. 2008) ("Even where the government has not denied a defense witness immunity for the very purpose of distorting the fact-finding process, the government may have stacked the deck against the defendant in a way that has severely distorted the fact-finding process at trial."). Not only does the record not support the argument, Seda also misunderstands the role of the court vis-a-vis the discovery he seeks.

This case involved substantial evidence from abroad, which presented obstacles for both parties. Nevertheless, both parties conducted investigations overseas and were able to obtain some evidence from foreign countries. For example, Seda sent an investigator to Egypt and Saudi Arabia to interview witnesses, including Seda's codefendant Al-Buthe. Seda located a potential witness in China, and the court granted Seda's motion to allow testimony by videoconference. The government sent agents to observe an interview by Egyptian authorities with El-Fiki. The government also sought records pursuant to international treaties and through its powers to subpoena documents from financial institutions. *See* 31 U.S.C. § 5318. Some of these efforts were successful, while others were not. Although both sides faced obstacles in obtaining evidence from abroad, there was no "stacked deck."

To assist in obtaining evidence from Egypt, Seda asked the court to order the government to use a Mutual Legal Assistance Treaty ("MLAT") between the United States and Egypt on his behalf. The express terms of the MLAT preclude Seda's reliance on it as a source of discovery: "[T]he provisions of this Treaty shall not give rise to a right on the part of any private person to obtain . . . any evidence. . . ." Treaty Between the Government of the United

States of America and the Arab Republic of Egypt on Mutual Legal Assistance in Criminal Matters, U.S.-Egypt, art. 1(4), May 3, 1998, T.I.A.S. No. 12948; *see also Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008) (describing the "background presumption . . . that '[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts'" (quoting Restatement (Third) of Foreign Relations Law of the United States § 907, Comment a, p. 395 (1986))).

Not only does Seda's claim fail under the express terms of the treaty, the district court had no authority to order the Executive Branch to invoke the treaty process to obtain evidence abroad for a private citizen. *See United States v. Rosen*, 240 F.R.D. 204, 213–14 (E.D. Va. 2007) (explaining that "the right to compulsory process extends only as far as a court's own process powers, and cannot be stretched to include compelling the invocation of treaty process powers available only to the Executive Branch"). Seda's *Westerdahl* analogy, which relates to immunity in the domestic context, does not extend to the world of international treaties. Our review of the complete record also reveals that the government's discovery conduct did not distort the fact-finding process.

Seda's *Westerdahl* analogy also fails with regard to the letters rogatory. The government's position on Seda's motions for letters rogatory could hardly skew the discovery process because the decision to issue a letter rogatory rests squarely within the discretion of the court, not the government. *See United States v. Staples*, 256 F.2d 290, 292 (9th Cir. 1958). Upon Seda's request, the district court issued a letter rogatory asking the government of Saudi Arabia to

assist in obtaining a deposition from Al-Sanad or facilitating his voluntary testimony at trial. The court received no response. The court declined to issue letters rogatory to Egypt with respect to El-Fiki, his son, and his employee because the potential testimony was not material. *See United States v. Liner*, 435 F.3d 920, 924 (8th Cir. 2006) (explaining that in a criminal case, "the moving party must show the witness's unavailability and the materiality of the witness's testimony"). El-Fiki and the associated witnesses in Egypt did not know Seda, did not communicate with Seda, and had no knowledge of either Seda's intent with regard to the tax return or the ultimate disposition of the donation. The court did not abuse its discretion in concluding that El-Fiki's intent regarding use of the money was not probative of Seda's own state of mind and thus was neither material nor necessary to ensure a fair trial.

## B. APPEALS TO FEAR

Seda argues that the government appealed to religious prejudices and guilt by association and thus deprived him of a fair trial, especially in light of the exclusion of some of his rebuttal evidence. *See United States v. Waters*, 627 F.3d 345, 354–56 (9th Cir. 2010). Because this case is being sent back for a new trial, we need not reach this issue. It suffices to say that the charge here relates to a false tax return filed on behalf of a tax-exempt organization, and does not allege material support to terrorism. We are confident that the district court will recognize the fine line separating necessary and probative evidence of willful falsity from evidence that would cast Seda in the role of a terrorist based on appeals to fear and guilt by association and thereby unduly prejudice the proceedings. *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) (recognizing that "evidence linking a defendant to

terrorism in a trial in which he is not charged with terrorism is likely to cause undue prejudice").

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR A NEW TRIAL.**

TALLMAN, Circuit Judge, concurring in part and dissenting in part:

This is a tax fraud case arising from a false declaration on a charitable organization's tax return claiming a donation was used to purchase a mosque in Missouri when it was actually sent to terrorists in Chechnya. The conviction and sentence imposed on Pirouz Sedaghaty, also known as Pete Seda, should be affirmed. To the extent my colleagues wish to reverse the district court's rulings and remand this case for a new trial, I respectfully dissent.[1]

Overall, the majority's opinion fails to take into account the exemplary manner in which a seasoned trial judge handled this case to ensure that the defendant received a fair trial, despite its substantive and logistical challenges. There are several critical flaws in the majority's analysis. First, and in contravention of the deference we owe the jury's verdict, the opinion's recitation of the facts is inappropriately written from the perspective of the defense theory of the case. Second, the majority unduly constricts the text of the search

---

[1] Readers of this opinion should be cautioned that to completely understand my analysis requires the necessary security clearance to review the classified portion of this dissent, contemporaneously filed under seal in the custody of the Classified Information Security Officer.

warrant and disregards the underlying reason for the very existence of the exclusionary rule in declaring the search unlawful.  Third, the opinion disregards District Judge Michael Hogan's express factual findings and his rulings on the potential impact of challenged witness testimony following an evidentiary hearing.  And, fourth, the opinion discounts the extraordinary efforts by the Department of Justice to abide by its criminal discovery obligations and the district court's extensive oversight of those efforts in dealing with the extremely sensitive national security concerns that underpin the investigation and prosecution of this case.

I

Contrary to the approach taken by the majority in its factual recitation, in a case involving a criminal conviction, "all reasonable inferences are to be drawn in favor of the government, and any conflicts in the evidence are to be resolved in favor of the jury's verdict."  *United States v. Alvarez-Valenzuela,* 231 F.3d 1198, 1201–02 (9th Cir. 2000). Furthermore, "[t]he evidence is to be considered in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 1201.  The jury convicted Seda after an eight-day trial and the majority opinion has failed to faithfully apply this legal principle of deference to the jury's resolution of contested facts on appellate review.  The rule respecting the jury's fact-finding is not confined to sufficiency of the evidence challenges as posited by the majority.  *United States v. Kim*, 25 F.3d 1426,

1432 (9th Cir. 1994) ("[O]n appeal we review the factual record in the light most favorable to the verdict.").[2]

A prime example of the majority's slant in favor of the defense is its dismissive discussion of the government's key evidence of Seda's willfulness in structuring the funds transfer to hide its intended purpose.[3]  The defendants' decision to structure the transaction in the form of traveler's checks to move the money from Oregon to Chechnya makes no sense if their intentions were benign and there was nothing to conceal.  Once the Al-Haramain Islamic Foundation, Inc. branch office based in Ashland, Oregon (Al-Haramain-US) received the $150,000 deposit wired from London by the Egyptian donor, Dr. Mahmoud Talaat Hasan El-Fiki, defendants could have easily and quickly wire-transferred the funds to Al-Haramain Islamic Foundation, Inc.'s main office in Saudi Arabia (Al-Haramain) through international correspondent banks at a cost of about $15.

---

[2] The majority implies that our court must only view the facts in the light most favorable to the jury verdict when the defendant has challenged the sufficiency of the evidence.  This is not only wrong, *see SEC v. Jasper*, 678 F.3d 1116, 1120 (9th Cir. 2012) (stating that "[w]e relate the facts here in the way most favorable to the jury verdict" even though sufficiency of the evidence was not raised on appeal), but it defies logic. When a jury reaches a verdict on any issue, we must respect the facts the jury necessarily found to reach that verdict.  That prerogative is even stronger when, as here, the defendant acknowledged that the evidence supports the verdict by opting not to challenge the evidence's sufficiency.

[3] The charge that Seda was ultimately convicted of, filing a fraudulent tax return under 26 U.S.C. § 7206, requires that a violator "*willfully* makes and subscribes any return, statement or other document . . . not believe[d] to be true and correct as to every matter."  (emphasis added).

Instead, the defendants spent $1,300 in service charges to divide $130,000 into $1,000-denomination American Express traveler's checks that are extremely difficult to trace once cashed. To further obscure their plan they withdrew another $21,000 as a cashier's check made payable to co-defendant, Soliman Al-Buthe, personally. Evidence showed he later deposited it in his personal bank account in Riyadh, Saudi Arabia. A reasonable jury could have concluded on this evidence that this was Al-Buthe's "cut" for serving as the courier.

Al-Haramain advertised more than a dozen bank accounts to collect donations, maintained a global presence in at least 50 countries, and operated with an annual budget of $30–$80 million for its charitable work. One would expect an organization of this size to keep automated banking records tracking its donations. Yet, when pressed during the investigation for documentation of the $150,000 transaction, Al-Haramain could only present through legal counsel two purported "receipts" with hand-written differing amounts for the same transaction. The government convincingly argued these documents were phony, and the district court properly admitted them only for the limited purpose of impeachment. The jury very well could have believed from the evidence presented that the transaction was structured in this manner so that the traveler's checks could be easily converted into untraceable cash in the Middle East with Al-Buthe taking his $21,000 for personal or nefarious use.

In addition to this evidence, the jury heard evidence of other related suspicious behavior by Seda and his confederates. Most significantly, there was the deceitful manner in which Seda hid the actual use of the $150,000 "donation" from his Oregon accountant, Tom Wilcox, by

falsely claiming it was kept in the United States and included in the $462,000 price of the Springfield, Missouri, mosque purchased to expand Al-Haramain-US operations. Then there is the fact that Al-Buthe properly declared the transport of negotiable instruments on nine other occasions, totaling $777,845, over a two-and-a-half-year period prior to the events in question. He filed a Currency and Monetary Instrument Report each time he traveled, but significantly did not do so when he carried the $151,000 in negotiable instruments from Oregon to Saudi Arabia.

The jury obviously thought the entire handling of the money reeked of criminal intent, as evidenced by its verdict. The complexity of the structured transactions was powerful evidence of Seda's willfulness to hide the true use of the money from the Internal Revenue Service (IRS) when he subscribed the false non-profit tax return. Despite this laundry list of nefarious behavior, the majority fails to recognize the cumulative effect of this important evidence, which ultimately resulted in the jury's verdict.

Aside from the financial disparities, there was other evidence introduced at trial to show Seda's intent to lie on the tax form and hide the real purpose to which the funds were put. An incriminating email was found during the search of Seda's residence in which Seda was communicating directly with Al-Haramain in Saudi Arabia following receipt of a battlefield report on activities in Chechnya. On January 22, 2000, just a month before the El-Fiki donation, the defendant copied into an email to co-defendant Al-Buthe a portion of a statement by Chechen commander of the Islamic Army of the Caucasus, Ibn Ul-Khattab, complaining that Islamic charities were not providing support to the mujahideen. The email contained the subject line "What Support?" Only a month

later Seda received the $150,000 from El-Fiki with a notation of "Use Zakat in order to participate in your noble support to our muslim Brothers in Chechnia."[4]

The jury also heard testimony from government expert witness Evan Kohlmann, who described the role of Al-Haramain in the Chechen conflict and its funding of terrorist activity under the guise of charitable donations. The "normal" process he described was that a "foreign national, in other words, a non[-]Chechen national, would travel with a suitcase of between [$]100 and $500,000, would bring it to a country nearby to Chechnya," and "[f]rom there the money would be couriered across the border into the Caucasus in Chechnya and be distributed to help support the mujahideen in the field." The Al-Haramain website also included an original copy of a fatwa[5] by Sheikh Abdallah Bin Jibrin, a senior influential cleric. It called for Muslims to "[s]upply [the mujahideen] with weapons and material support which they would utilize to struggle and fight those who fight them." Muslims were obligated to "[s]upport [the Mujahideen] financially as they [we]re in dire need for food and clothing."

It is not hard to see why the jury found that Seda willfully failed to disclose to the IRS the true activities of his

---

[4] Zakat is one of the pillars of Islam and is the giving of obligatory alms or charity, similar to a tithe. "Zakat means to provide charity to suffering Muslims," which some interpret to include "distribut[ion] to Muslim fighters who are fighting a larger opponent," like the Chechen mujahideen at war with the Russian army.

[5] A fatwa issued by a cleric "is the equivalent of a ruling on a particular issue regarding Islam or Muslims, and it is incumbent upon anyone who follows the person issuing the fatwa to follow the advice given."

§ 501(c)(3) charitable organization when he signed the informational Form 990 tax return. The defendants' activities and the circumstantial evidence surrounding them mirrored the *modus operandi* employed by those who smuggled money to Chechnya, as called upon by the fatwa announced publicly on Al-Haramain's own website. Coupled with incriminating computer evidence recovered by forensic examiners from his deleted hard drives, the jury could reasonably infer that Seda was well aware of the intended recipient's use for any donations from Al-Haramain-US.

II

The incriminating evidence seized from Seda's Ashland prayer house properly fell within the scope of the search warrant. On behalf of the defense, the majority opinion manufactures its argument to limit the scope of the search. We agree that Seda's steadfast argument advanced in his briefs—that the affidavit was not incorporated—is untenable. However, the majority's newly created argument invalidating the search is also flawed. First, it refuses to acknowledge that when properly read as a whole the warrant's language allowed for the collection of the records seized. And, second, even if the agents exceeded the intended scope of the search warrant, the exclusionary rule should not bar the use of the collected evidence based on the good faith exception.

A

The search warrant described the "ITEMS TO BE SEIZED" as all "[r]ecords and communications" to include all "[e]vidence concerning the subscription to a false Form 990 Tax Return, in violation of 26 U.S.C. § 7206(1), *as described in the attached affidavit*, for the year 2000."

(emphasis added). Records and communications were defined as "electronic records and communications involving the individuals or entities" associated with the violations. The subjects of the search warrant included the two defendants, two other known Al-Haramain officials, the donor of the money ultimately delivered to the Chechen mujahideen, as well as five related Al-Haramain entities. Furthermore, the search warrant defined a careful procedure to search computers for all "records stored or modified in any form." If during the search the law enforcement computer personnel determined it was not practical to complete the search of the computers on-site, then the computers could be "seized and transported to an appropriate law enforcement [forensic] laboratory for review."

The difference in the way the majority approaches the search warrant inquiry reflects a fundamental difference in our views of how searching agents are guided by the court's authorization of items to be seized in light of the more detailed statements in the incorporated (and physically present) affidavit of facts establishing probable cause for its issuance. The majority focuses upon the words "limited to the following" while ignoring the 33 pages of detail outlining the multi-year joint FBI/IRS/ICE investigation "as described in the attached affidavit" incorporated by reference.

"The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession." *Andreson v. Maryland*, 427 U.S. 463, 480 n.10 (1976). A search warrant may include a class of generic items or goods to be searched, as it did here, "if there are objective, articulated standards for the executing

officers to distinguish between property legally possessed and that which is not." *United States v. Hilyard*, 677 F.2d 1336, 1340 (9th Cir. 1982). "The standards may be contained in the search warrant or . . . in the accompanying affidavit" if properly incorporated. *Id*.

Seda does not challenge the sufficiency of the showing of probable cause to support issuance of the warrant. And once armed with the court's authority to search the Ashland premises utilized by the subjects of the investigation, agents were certainly entitled to seize items of obvious evidentiary significance to that investigation as detailed in the accompanying statement of probable cause. In short, there is no requirement in law that limits items to be seized solely to those expressly listed in the search warrant. The overarching Fourth Amendment principle is, as set forth in this dissent, one of "reasonableness" under the totality of the circumstances. *See United States v. Villamonte-Marquez*, 462 U.S. 579, 588 (1983).

1

To determine whether the seized items fell within the scope of the search warrant, it is important to consider the *mens rea* the government is required to prove beyond a reasonable doubt in this type of case. The statutory language of 26 U.S.C. § 7206 requires that a person *willfully* completes and signs a tax return that the person "does not believe to be true and correct as to every matter." In order to establish the *mens rea* that Seda "willfully" filed a false tax return, the government needed to explain the context in which he directed his accountant to prepare the 2000 tax return for his organization. The government knew when requesting the search warrant that gathering evidence to show why Seda

wanted to hide the true use of the donation was an important element of their case. Why else would Seda and his confederates have structured their transactions in such deceitful ways?

To that end, the search warrant incorporated by reference and the magistrate reviewed an affidavit with background materials describing the probable cause related to the El-Fiki payment to Al-Haramain in support of the armed conflict in Chechnya. The affidavit includes more than five pages of sworn testimony by the case agent[6] specifically attesting to the connections between Seda, Al-Haramain, the Chechen conflict, donations, and mujahideen military forces. The materials collected by the government were relevant to these topics and helped establish the necessary *mens rea* for conviction. Although the majority argues that no "hyper-technical parsing of the language" of the search warrant affidavit is required, to interpret it as my colleagues suggest renders a large portion of the affidavit superfluous.

As suspected and later confirmed by the excessive quantity of materials found in his possession, Seda had an obsessive interest in Chechnya and the armed forces involved in the conflict. The seized materials supported the government's contention that Seda's zealous interest rose to a level that compelled him to send money to aid the struggle, which then drove him to falsify the non-profit tax return to cover up his support. The majority's benevolent characterization of the evidence as "Seda's internet browsing of religious web sites" or "correspondence with friends and co-workers," overlooks the fact that these web sites and

---

[6] The IRS case agent in charge of the Seda investigation was IRS Special Agent Colleen Anderson.

listserv emails encouraged a call to arms and corroborated the description of Al-Haramain and its terrorist activities in the affidavit. Judge Hogan's factual determinations regarding the express terms of the search warrant and incorporated affidavit were not clearly erroneous. *United States v. Giberson*, 527 F.3d 882, 886 (9th Cir. 2008) ("We review . . . the district court's underlying factual findings for clear error.").

The majority's concern regarding the scope of the search is unfounded, and even my colleagues agree that the warrant actually incorporated the case agent's sworn affidavit. We have held that:

> [t]he warrant requirement is a means of preventing arbitrary and unreasonable invasions of privacy; the search warrant itself is the tangible evidence that precautions have been taken to ensure that no such invasion has occurred. When the officer who requests authorization for the search, the magistrate who grants such authorization, and the officers who execute the search expressly rely upon a given set of papers containing a given series of words, they identify *that* set of papers and *that* series of words as the proof that proper precautions were taken to prevent an unreasonably invasive search.

*United States v. Towne*, 997 F.2d 537, 548 (9th Cir. 1993).

It is a "well-settled principle that a warrant's overbreadth can be cured by an accompanying affidavit that more particularly describes the items to be seized." *Id*. at 544 (citing *United States v. Luk*, 859 F.2d 667, 676 (9th Cir.

1988)). An affidavit is "part of a warrant, and therefore potentially curative of any defects, . . . if (1) the warrant expressly incorporated the affidavit by reference and (2) the affidavit either is attached physically to the warrant or at least accompanies the warrant while agents execute the search." *United States v. SDI Future Health Inc.*, 568 F.3d 684, 699 (9th Cir. 2009). "When we say that a warrant may be so facially deficient that it precludes reasonable reliance, what we mean is that '[o]fficers poised to conduct a search should be able to ascertain that such a warrant fails to offer sufficiently detailed instruction and instead leaves them guessing as to their task.'" *Towne*, 997 F.2d at 549 (quoting *Ortiz v. Van Auken*, 887 F.2d 1366, 1370 (9th Cir.1989)).

The majority mischaracterizes the warrant as underinclusive and then determines that an affidavit cannot be read to broaden the scope of the warrant. However, if these documents are correctly read, this argument fails. The warrant in this case is not underinclusive. It broadly allows for the collection of all evidence related to the preparation of a false tax return. It is the affidavit that then zeros in on the evidence the investigation had already uncovered related to Al-Haramain and its connections to funding the mujahideen's activities in Chechnya. The affidavit appropriately narrowed the search to these activities, the underlying reason why Seda falsified the Al-Haramain-US's tax return. Just as described in *Luk*, *supra*, the appropriately incorporated affidavit "cured" any potential overbreadth of the warrant, and the majority's argument collapses.

2

The government went to great pains to comply with the limitations of the warrant. Before giving his independent

approval, United States Magistrate Judge John Cooney read the search warrant, supporting attachments, and the case agent's sworn affidavit, incorporated by reference. Prior to conducting the search, the prosecution and the case agent developed a search procedure to be followed with a designated seizing officer and computer-search protocol. The case agent briefed the nearly 20 agents on site and gave each agent a copy of the search warrant to read.[7] All of the search warrant documents were available on site for further reference during the search. Seda's personal attorney also

---

[7] Because the case agent was both the affiant and led the execution of the search warrant, any concerns regarding the seizures should be foreclosed. As noted by the Tenth Circuit:

> [i]t would be anomalous to permit an officer's knowledge of the terms of the affidavit to cure a lack of particularity on the face of a warrant but not permit the officer's knowledge to clarify the practical meaning of a term in a facially valid warrant. Because an affidavit can be used to demonstrate that a warrant is not constitutionally invalid for lack of particularity when the same officer produces the affidavit and executes the warrant, an affidavit also may be used to clarify with 'practical accuracy' the meaning of a disputed term in a warrant when the same person is both affiant and executing officer.

*United States v. Ortega-Jimenez*, 232 F.3d 1325, 1329 (10th Cir. 2000); *see also Massachusetts v. Sheppard*, 468 U.S. 981, 989 n.6 (1984) ("the officer who [wrote the affidavit and] directed the search, knew what items were listed in the affidavit presented to the judge, and he had good reason to believe the warrant authorized the seizure of those items."); *United States v. Durk*, 149 F.3d 464, 466 (6th Cir. 1998) (recognizing that where the same officer applies for and executes the warrant, a mistaken search is unlikely); *United States v. Beaumont*, 972 F.2d 553, 562 (5th Cir. 1992) (relying on the executing officer as the affiant for support in upholding particularity of the warrant).

reviewed the search warrant and affidavit when he was summoned to the property by Seda's son. The case agent consulted throughout the search with the prosecutor for legal guidance regarding the seizure of particular items. Some documents were seized only after Seda's son talked with Seda's attorney on site and gave voluntary consent.

The majority's concerns regarding a "kitchen sink" affidavit and the possible dangers of coming across papers not authorized by the search are misguided. My colleagues barely acknowledge the extensive forensic reconstruction required to salvage any usable evidence from the deleted hard drives. The investigation then employed an independent taint team, unrelated to this investigation, to sift through the electronic materials gained from the search and distinguish between those that were within the scope of the search, and those that were not. The case agent developed specific search terms in conjunction with forensic examiners to cull the relevant data and focus on the individuals and items listed in the affidavit of probable cause. When the computer search revealed evidence of an unrelated crime, agents immediately sought and obtained a second search warrant.

3

Additionally, the district court conducted an evidentiary hearing on this issue, and Judge Hogan specifically found that the search was reasonable and that agents faithfully followed the issuing magistrate judge's directions in conducting the computer searches, employing appropriate protocols. The district judge concluded that "the warrant, including the affidavit incorporated into the warrant, was reasonably specific as to the items sought and the government followed appropriate protocols to separate intermingled materials."

And, "[t]he crimes charged require proof of intent and thus records beyond simple financial records were appropriately seized, such as evidence of support of the efforts of the Chechnyan [Chechen] mujahideen." Furthermore, Judge Hogan determined that "[g]iven the nature of the data and the fact that it had been deleted, the actions taken by the government were reasonable and permitted by the warrant as approved by Magistrate Cooney." We must defer to factual findings unless they are clearly erroneous. *Giberson*, 527 F.3d at 886.

4

The seized inculpatory evidence did not exceed the scope of the search warrant. The majority's reliance on *Doe v. Groody*, 361 F.3d 232 (3d Cir. 2004), is misplaced and easily distinguishable when the search warrant is considered in conjunction with the incorporated affidavit. Based on *Groody*, the majority states that "an affidavit cannot be relied upon to authorize a search beyond the scope of a judicially authorized warrant." *See id.* at 241.

However, the search in *Groody* exceeded the scope because the warrant failed to incorporate the affidavit. *Id*. at 236, 239–41. This detail, disregarded by the majority, drove the Third Circuit's entire analysis. It is simple logic that when an affidavit is not incorporated then law enforcement is precluded from relying upon it and to do so would exceed the scope of the warrant. As noted in that decision, "[w]ere we to adopt the officers' approach to warrant interpretation, and allow an unincorporated affidavit to expand the authorization of the warrant, we would come dangerously close to displacing the critical role of the independent magistrate." *Id.* at 241.

But here, the majority agrees that the affidavit was incorporated, and it was available during the search to guide the agents executing the warrant. This undermines any application of the *Groody* decision to this case. The critical role of the neutral and detached magistrate was not displaced. Because the scope of the search was permitted under the warrant and was reasonable on the facts of the case, there was no Fourth Amendment violation. *See Michigan v. Fisher*, 558 U.S. 45, 47 (2009) ("[T]he ultimate touchstone of the Fourth Amendment . . . is 'reasonableness.'").

The majority's reliance on *United States v. Kay*, 432 F.2d 647 (D.C. Cir. 1970), and *United States v. Angelos*, 433 F.3d 738, 746 (10th Cir. 2006), also misses the mark. In both of the cases the issue on appeal was whether law enforcement searched a permissible location, such as Kay's upstairs apartment which had a "separate and distinct" entrance and a different street address than the one listed on the warrant. *Kay*, 432 F.2d at 649. The express language of the warrant in *Kay* only included the location of the search as 3618 14th Street, whereas the apartment's actual address was 3618 ½ 14th Street. *Id.* at 648–49. The affidavit included a reference to the "entire premises" of "a two story brick building" at "3618 14th Street." *Id*. at 649. On appeal, the court held that based on the facts of that case, "the description in the search warrant, not the language of the affidavit . . . determin[ed] the place to be searched." *Id.* In *Angelos*, the Tenth Circuit held the officers exceeded the scope of the warrant where the listed search location on the face of the warrant was a safe and a car, but officers additionally searched the entire home based on two references to the "residence/premises" made in the affidavit. 433 F.3d at 745–46.

First, these cases are not applicable because this case is not about an incorrect search location. Here, the agents dutifully searched the appropriate premises and received consent to extend the search to trailers not included in the description of places to be searched in Attachment "A." It is telling that these are the best cases the majority can find to make their argument. There are no cases on point denying that an affidavit can be used to clarify and narrow the warrant when it comes to determining which evidence may be seized.

And, second, as previously discussed, the majority's argument that the affidavit in this case expanded the scope of the warrant is a mischaracterization. The affidavit appropriately limited the warrant to the focused evidence described therein. Furthermore, although the majority attempts to analogize searching an incorrect location to seizing items outside the scope, that gloss ignores the inherent difference between these two elements of the Fourth Amendment. A particularized location is a requisite element for a reasonable search. Regardless of the items seized, law enforcement must first be at the right location. Location is a finite concept, whereas the search warrant's description of all "[e]vidence concerning the subscription to a false Form 990 Tax Return, in violation of 26 U.S.C. § 7206" requires factual context, the role of the affidavit. The analysis from these cases is not an apples to apples comparison, and it cannot be extended to cover the search here. At bottom, the evidence was appropriately seized because, just as Judge Hogan found, the warrant combined with the affidavit authorized the collection of evidence indicative of Seda's willful intent to falsify the Al-Haramain-US tax return.

B

But, even if the majority is correct in finding that the search exceeded the scope of the warrant, under the good faith exception recognized by the Supreme Court in *Leon* and *Herring*, suppression would not serve the purpose of deterrence. *See United States v. Leon*, 468 U.S. 897 (1984); *Herring v. United States*, 555 U.S. 135 (2009). "Suppression of evidence . . . has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). The Supreme Court has rejected reflexive application of the exclusionary rule. *Id.* "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144. There is no evidence of any such misconduct here. "Whether the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" *Leon*, 468 U.S. at 906 (quoting *Illinois v. Gates*, 462 U.S. 213, 223 (1983)). "[T]he exclusionary rule has never been applied except where its deterrence benefits outweigh its substantial social costs." *Hudson*, 547 U.S. at 594 (internal quotation marks omitted).

Here, the balance weighs strongly in favor of not applying the exclusionary rule. "[W]hen law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system." *Leon*, 468 U.S. at 908. The government went to great lengths to conduct a reasonable search. The search warrant incorporated a lengthy affidavit for the magistrate's review. There was an established on-site search

procedure and computer search protocol with defined search terms.   The case agent consulted with the prosecutor throughout the execution of the warrant to make sure the search was appropriately conducted.   The exclusion of evidence in this case would not serve to deter misconduct in the future where every indication was that law enforcement agents complied with the scope of the search warrant.  Agents acted in good faith under *Leon* and *Herring,* and accordingly, exclusion is not warranted.

III

Judge Hogan conducted a full evidentiary hearing to consider the proposed impeachment evidence regarding Barbara Cabral discovered after trial.  We should defer to the district court's factual findings, which were not clearly erroneous, in upholding his legal determination that the undisclosed evidence was not material under *Brady v. Maryland*, 373 U.S. 83 (1963).   The majority applies complete de novo review to the three-step inquiry and fails to give the appropriate level of deference we owe the trial court. Unlike here, for its standard of review, the majority relies upon a case that did not involve an evidentiary hearing regarding the *Brady* violation.  *United States v. Pelisamen*, 641 F.3d 399 (9th Cir. 2011); *see also United States v. Howell*, 231 F.3d 615 (9th Cir. 2000).

This procedural difference is telling.  As we noted in *United States v. Price*, "[w]hile it is clear that the legal questions at issue in a *Brady* claim are reviewed de novo, this circuit has not yet 'had the opportunity to consider what, if any deference should be afforded to a district court's factual findings . . . .'"  566 F.3d 900, 907 n.6 (9th Cir. 2009) (citing *United States v. Jernigan*, 492 F.3d 1050, 1062 (9th Cir.

2007) (en banc) (Bea, J. dissenting)). In *Price*, we avoided this open question because the judge ruled on the motion for a new trial from the bench. *Id*. However, in this case Judge Hogan denied Seda's motion for a new trial in a written order with express factual findings after taking testimony in both written and oral form and holding an *in camera* hearing. These facts cannot be ignored on appellate review.

We should follow the First, Second, Third, Fifth, Seventh, Eighth, Tenth and Eleventh Circuits and the United States Court of Appeals for the District of Columbia, all of whom have recognized this difference in procedural posture and given the requisite deference to the trial court's factual findings on appeal. *Jernigan*, 492 F.3d at 1062, 1062–64 (Bea, J., dissenting) (citing and discussing each case). This is because although legal issues are analyzed de novo, "a *Brady* determination is inevitably a contextual inquiry, involving questions of both law and fact." *United States v. Sipe*, 388 F.3d 471, 479 (5th Cir. 2004). Our sister circuits apply appellate deference to a district court's factual findings bearing on *Brady* materiality, and recognize that the trial judge—who listened to the witnesses, heard their testimony, and watched as they gave it—is in a far superior position to assess materiality than we are on a cold record. *United States v. Boyd*, 55 F.3d 239, 242 (7th Cir. 1995).

The *Brady* analysis depends on "nested" factual determinations which strongly influence the legal determination. *See United States v. Sanchez*, 917 F.2d 607, 618 (1st Cir. 1990); *United States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993). The correct standard of review must be applied to each step of the analysis. In this case Judge Hogan necessarily had to analyze: (1) the impact of the undisclosed impeachment evidence specifically on Cabral's overall

testimony; (2) the impact, if any, of that determination on all the other evidence presented in the case (28 out of 1,800 pages of trial testimony); and (3) whether it was significant enough to undermine our confidence in the outcome of the jury's verdict. Thus, while question three is a legal question subject to de novo review, questions one and two are inherently factual determinations that require our deference unless they are clearly erroneous. To rule otherwise would amount to appellate fact-finding. *Jernigan*, 492 F.3d at 1059 (Bea, J., dissenting).

Accordingly, after conducting an *in camera* proceeding to review the contested evidence and taking evidence from various witnesses, including Barbara Cabral, Judge Hogan properly determined that the withheld information did not violate the standard of *United States v. Bagley*, 473 U.S. 667, 682 (1985). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*

*Brady* requires the disclosure of evidence only if it is "both favorable to the accused and 'material either to guilt or to punishment.'" *Id.* at 674 (quoting *Brady*, 373 U.S. at 87). A prosecutor only violates a "constitutional duty of disclosure" where the "omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs*, 437 U.S. 97, 108 (1976). While the government admits it erred by not turning over possible impeachment evidence related to the testimony of Barbara Cabral, when the district court's factual findings are considered, within the context of the eight-day trial as a whole, Judge Hogan correctly determined that the withheld

information did not rise to a level that deprived Seda of a fair trial.

On March 17, 2010, well before commencement of trial on August 30, 2010, the United States disclosed Barbara Cabral as a witness who would "testify a[b]out observations made while attending functions at the Al-Haramain Islamic Foundation, Inc. in Ashland, Oregon." The most damaging testimony she offered was that at the conclusion of the Hajj in the Spring of 1999, while she, Seda, and others were in Saudi Arabia traveling on money provided by Al-Haramain, Seda collected $200 from each group members' remaining funds for blankets and food for Chechen freedom fighters. The evidence was only circumstantially relevant since El-Fiki did not make his $150,000 "donation" until nearly a year later. The disputed tax return for Al-Haramain-US, which misstated how those funds were actually used, was not filed until October 2001, more than 18 months after the Hajj.

The defense claims that the government's failure to disclose information regarding Barbara Cabral warrants a new trial under *Brady* and *Bagley*. But the district court held an evidentiary hearing on this issue and entered findings of fact adverse to the defense position:

> Indeed, of the 1800 page transcript generated from the trial, Barbara Cabral's testimony takes up only 28 of those pages. She was aggressively cross-examined. There was some significance to the terrorist issue because the government ostensibly wanted to establish a reason for the tax fraud. But Cabral's testimony was immaterial to the jury's convictions on the charges presented because

> it did not matter where the money fraudulently reported on the tax return actually went and because of other significant evidence regarding willfulness. The government's case centered on the accountant, Thomas Wilcox's testimony.

> The government's focus on the issues surrounding the mujahideen has a greater relation to any enhancement during the sentencing phase. The materiality of Cabral's testimony to that question is a little more clear given that this was really the only direct evidence about defendant's desire to fund the mujahideen.

Ultimately, Judge Hogan chose not to impose the sentencing enhancement for terrorism to which Cabral's testimony was relevant. U.S.S.G. § 3A1.4(a).

Also, relevant to willfulness, there was other significant, independent evidence supporting the jury's finding. Daveed Gartenstein-Ross, a former employee of Al-Haramain-US, independently testified that Seda talked about gathering money for mujahideen forces in Kosovo. There was ample evidence in the record from emails and other items seized from Seda's computers at the Ashland prayer house that showed his intent to covertly support the mujahideen in Chechnya, including visits to multiple Jihadi web sites, a pro-Chechen mujahideen listserv, and battlefield photographs of the mujahideen. The government obtained still photos from Seda's home taken from a mujahideen fundraising video showing a training camp, as well as other seized items, with the consent of defendant's son, whose counsel was present

during the search. The jury heard background expert testimony about the Chechen conflict and the relationship between Al-Haramain, the Saudi Joint Relief Committee, and support for the mujahideen.

Most damning, the jury was certainly entitled to infer from the deletion of the computer hard drives that Seda acted with criminal intent. Experienced prosecutors, criminal defense lawyers, and judges know that juries give heightened weight to a suspect's efforts to destroy or secrete incriminating evidence. Seda had ample notice since 2001 that he was under investigation prior to execution of the search warrant in February 2004. When agents seized his computers three years into the investigation, they discovered that the hard drives had been deleted. It was only through forensic computer examination that the government was able to laboriously restore the incriminating information and piece together the inculpatory evidence in this case.

Given the quantity of alternative, independent evidence, and when considered cumulatively, it is unlikely that the failure to disclose the payments to Cabral's husband, Richard, and the interview notes, which arguably might have impeached her testimony, materially prejudiced the defense. As Judge Hogan, who presided over the trial, so found.

The majority opinion's reference to discrepancies in the interview notes of Richard Cabral are irrelevant. Because he passed away during the investigation of this case and was therefore unavailable during trial for cross-examination, any relevant statements he made during the investigation would have been inadmissible under Federal Rule of Evidence 802 as hearsay within hearsay, not subject to an exception.

The district court's factual findings are not clearly erroneous, and the majority errs in failing to give appropriate deference. Judge Hogan correctly determined that the error was not so substantially injurious as to warrant a new trial because the result would have been no different. *See Bagley*, 473 U.S. at 682. The jury could easily have reached the same conclusion without even considering Barbara Cabral's testimony and accordingly its exclusion did not serve to undermine confidence in the outcome of the trial.

IV[8]

Contrary to the majority's ruling, the unclassified summary complied with the requirements of the Classified Information Procedures Act (CIPA). 18 U.S.C. app. 3, § 4. The law permits the creation of an unclassified summary report or substitution of a statement admitting relevant facts helpful to the defense in lieu of disclosing state secrets. *Id.* The government has the burden under Federal Rule of Criminal Procedure 16 to disclose evidence "both favorable to the accused and material either to guilt or to punishment." *Bagley*, 473 U.S. at 674 (citing *Brady,* 373 U.S. at 87). CIPA authorizes the government to submit an *ex parte* motion to the district court to reveal that it is in possession of relevant documents and to conduct *in camera* proceedings *ex parte* where classified information responsive to this obligation exists. 18 U.S.C. app. 3, § 6.

---

[8] The analysis in the unclassified dissent is constrained to a discussion of only unclassified evidence. A more complete analysis of the substitution is included in the classified dissent under the protection of the Classified Information Security Officer.

This left the government and the court in the awkward position of having to sift through classified documents from the intelligence community to try to determine if any contained exculpatory information helpful to Seda's defense. *United States v. Amawi,* 695 F.3d 457, 471 (6th Cir. 2012) ("Rather than neutrally deciding disputes with an open record based on the adversarial process, [the court] must place [itself] in the shoes of the defense counsel, the very ones who cannot see the classified record, and act with a view to their interests."); *see also United States v. Mejia*, 448 F.3d 436, 458 (D.C. Cir. 2006) (noting the difficult predicament of "the defendants and their counsel, who are in the best position to know whether information would be helpful to their defense, [but] are disadvantaged by not being permitted to see the information and . . . assist the court in its assessment of the information's helpfulness").   The court must determine whether there is exculpatory material and whether an unclassified summary or statement of admitted facts can be crafted to effectively substitute for production of the documents themselves, which cannot be disclosed for reasons of national security.  18 U.S.C. app. 3 § 4.

The unclassified summary report given to Seda 18 months before trial complied with the requirements of CIPA as defined in § 6(c)(1).  "The district court must accept [the substitution] if it will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information."   *United States v. Moussaoui*, 382 F.3d 453, 477 (4th Cir. 2004) (internal quotation marks omitted).  There was no abuse of discretion here because the court provided the defense with all the necessary details from the withheld documents to follow any potential investigative leads.

The underlying documents themselves were inadmissible under Federal Rule of Evidence 802 as hearsay within hearsay, not subject to an exception. The court issued letters rogatory submitted by the defense asking the Kingdom of Saudi Arabia for access to Sami Al-Sanad, the subject of the summary document substitution, while he was in its custody. The defense had already interviewed Soliman Al-Buthe, the other individual named in the summary, on multiple occasions, while ironically the prosecution was refused official access to interview any Saudi citizens.

The defense objected to the introduction of the government's summary, but it offers no explanation for not proposing a stipulation in slightly revised form so as to get before the jury Al-Sanad's claim that the money was to be used for legitimate humanitarian purposes in Chechnya. The defense initially marked the summary as Defense Exhibit 730, but then just ten days before trial raised its first concern regarding its contents. In a hearing seven days later, Judge Hogan stated, "I want to look at that again." Defense counsel reiterated his concern regarding the summary, but in the same hearing and prior to Judge Hogan ruling on the objection, defense counsel withdrew the exhibit. At trial, the defense team did not renew the objection to the unclassified summary.

An issue is preserved for appeal "where the substance of an objection has been thoroughly explored and the trial court's ruling was explicit and definitive." *United States v. Palmer*, 3 F.3d 300, 304 (9th Cir.1993). Although "there is no requirement that a party engage in a futile and formalistic ritual to preserve the issue for appeal," that is not this case. *United States v. Varela-Rivera*, 279 F.3d 1174, 1177–78 (9th Cir. 2002).

The summary had been provided to the defense with sufficient time to litigate over its contents.  The defense team never offered an alternative version to the trial court for consideration as a possible compromise.[9]  The defense team did not afford Judge Hogan an opportunity to make an "explicit and definitive" ruling on its objection prior to withdrawing the exhibit.  Nor did the defense team reiterate its objection at trial to preserve the issue on appeal.

By failing to offer an acceptable alternative, failing to seek an "explicit and definitive" ruling on the objection, failing to object to the summary's language at trial, and choosing to withdraw the exhibit prior to trial, Seda waived any challenge to this claim.  Deference is owed to defense counsel's trial strategy, and we cannot speculate now after the jury has spoken as to why defense counsel chose not to pursue their objection further, nor offer the exhibit at trial. We should not countenance this tactical maneuver on appeal where Seda waived any objection by failing to preserve it at trial.

Judge Hogan went to extraordinary lengths to conduct multiple *in camera* proceedings and appropriately review related classified information in an effort to meet the commands of CIPA.  There was no abuse of discretion in the court's authorization of the substituted summary, but because of the waiver, we should not even reach this issue.

---

[9] The majority argues that defense counsel was not in the position to offer alternative language.  However, ten days before trial, defense counsel could certainly have brought the court's attention to the specific words which it considered "editorialized" and recommended less pejorative alternatives.

V

A capable district court judge had a daunting task in overseeing this complex case, and the record shows he fairly balanced the competing interests at stake.  The search did not exceed the scope of the properly authorized warrant and its incorporated affidavit.   The procedures employed in its creation and execution were measured and appropriate.  The district court's factual findings were not clearly erroneous, and the determination that the potential impeachment evidence regarding Barbara Cabral did not warrant a new trial was correct.   The unclassified summary appropriately complied with the requirements of CIPA and balanced the need to protect national security with Seda's right to present a defense.  Under these difficult circumstances, Seda got a "fair trial," even though it might not have been a "perfect one." *Ross v. Oklahoma*, 487 U.S. 81, 91 (1988).  For these reasons, I would affirm the conviction and the trial court's rulings.